**MONTANA FAIR HOUSING, INC., Summit Independent Living Center, Inc., Betty Sept on her own behalf and as Personal Representative of Maude Jeffries, and Bill Chatterton, Plaintiffs,**

v.

**AMERICAN CAPITAL DEVELOPMENT, INC.; Wildflower Apartments a/k/a Wildflower Associates; Property Maintenance and Supply, Inc.; Creekside Apartments Limited Partnership; W & K Associates, Inc., American Property Development, Inc.; American Home Builders, Inc.; American Property Management, Inc.; Ray Terry; Shiloh Glen Apartments, a Partnership; Shiloh Glen Associates; Roger W. Kuula; and Jon A. Wood, Defendants.**

### No. CV 98–123–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Nov. 30, 1999.

Timothy C. Kelly, Kelly Law Office, Emigrant, MT, Christopher Brancart, Brancart & Brancart, Pescadero, CA, for Montana Fair Housing, Inc., Betty Sept, Bill Chatterton, plaintiffs.

Mary Gallagher, Montana Advocacy Program, Missoula, MT, for Summit Independent Living Center, Inc., plaintiff.

Calvin J. Stacey, Stacey & Walen, Billings, MT, for Wildflower Apartments, Wildflower Associates, defendants.

Peter F. Habein, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, MT, Carolyn Doppelt Gray, Epstein Becker & Green, Washington, DC, for American Capital Development, Inc., Property Maintenance and Supply, Inc., Creekside Apartments Limited Partnership, W & K Associates, Inc., American Property Development, Inc., Ray Terry, Shiloh Glen apartments, Shiloh Glen Assoc., defendants.

Calvin J. Stacey, Stacey & Walen, Billings, MT, Peter F. Habein, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, MT, for Roger W. Kuula, Jon A. Wood, defendants.

## ORDER

MOLLOY, District Judge.

### Background

This case commenced on September 14, 1998, when Plaintiffs filed a complaint alleging violations of the Fair Housing Act, the Montana Human Rights Act, and Section 504 of the Rehabilitation Act of 1973. The complaint also alleges breach of the covenants and warranties concerning the property and failure to hire, train, and supervise personnel for compliance with state and federal fair housing laws. Plaintiffs seek compensatory and punitive damages, declaratory judgment that Defendants violated fair housing laws, a permanent injunction against violations of the law, an injunction to retrofit each covered unit for compliance with the fair housing laws and to adopt nondiscriminatory policies, and an order establishing two funds, of $770,000 and $370,000, respectively, for the construction or renovation of low-income housing in Missoula and Billings. These amounts are based on the tax credits Defendants received for operating the apartments as low-income housing. Plaintiffs also request attorneys' fees.

Defendants are business entities that develop, design, construct, and manage low-income housing. Also named are three individuals. Two, Roger Kuula and Jon Wood, are partners in the named business entities and actively participated in the development, design, construction, and management of Wildflower, Creekside, and Shiloh Glen. The third individual is Ray Terry, the architect with principal responsibility for designing Wildflower Apartments in Missoula.

This partial summary judgment motion, the first of two anticipated motions, is directed at Wildflower Apartments, located

at 1250 34th Street in Missoula. It is directed only at certain violations of the Fair Housing Act and the Montana Human Rights Act. Plaintiffs reserve some of their arguments against Wildflower under the Fair Housing and Human Rights Acts and all of its arguments under Section 504 of the Rehabilitation Act. Plaintiffs also reserve arguments against Creekside Apartments in Missoula and against Shiloh Glen in Billings.

I heard oral argument on Plaintiffs' motion on November 4, 1999. I find in favor of the Plaintiffs, with the exception of Bill Chatterton, who lacks standing.

### Facts

In March 1992, Roger Kuula applied to the Montana Board of Housing for allocation of low-income tax credits to Wildflower Associates. Wildflower Associates is comprised of Kuula and Jon Wood. Kuula is also a president of American Property Development, Inc., a director and 50% shareholder of American Capital Development, Inc., and president and sole owner of American Property Management, Inc. Wood is a general partner in Wildflower Associates, a president of American Capital Development, Inc., co-manager with Kuula of its overall operations, and vice-president of Property Management and Supply, Inc.

Defendant business entities are financed in part by low-income tax credits. To obtain these credits, Kuula signed a restrictive covenant for Wildflower that required compliance with the Fair Housing Act. Among other things, the Act requires dwellings constructed for occupancy after March, 1991, to feature wheelchair-accessible doors, accessible routes into and through the dwelling, accessible light switches, outlets, and environmental controls, and reinforced bathroom walls suitable for later installation of bathtub grab bars. The State of Montana adopted parallel requirements in the same year. In addition, at least from 1994 through 1997, Kuula was required to personally certify in writing that Wildflower was "not in de-

fault" of the Fair Housing Act covenant. Kuula's initial application for low-income housing tax credits was successful, and Wildflower has since received over $370,-000 in tax credits from the Montana Board of Housing.

Architect Ray Terry, a former employee of Property Management and Supply, Inc., and now an employee of American Property Development, Inc., began to design the Wildflower Apartments in 1992. Property Management and Supply, now known as American Home Builders, built Wildflower. The complex was completed in 1993. Terry believed Wildflower was built in accordance with fair housing laws. Terry Aff. at ¶ 20. He inquired with the Building Inspection Division of the Missoula Department of Public Works and was assured that adaptive design, permitting the later installation of accessibility features, was sufficient. *Id.* at ¶ 10; *see also* Terry Aff. Attachments B, C. However, Terry's blueprints also include the following "Accessibility Compliance Statement":

> All living units on the ground floor at level entrances and patio doors shall have thresholds with a maximum rise of 1/2″.

> In compliance with the Federal "Fair Housing Amendments Act" of 1988, the living units will include the following:
> —usable doors (32″ clear width)
> —accessible route into and through the unit
> —reinforced walls for grab bars
> —usable kitchens and bathrooms

When Betty Sept and her mother, Maude Jeffries, moved into Unit F–101 in April 1994, Jeffries used a cane to enhance her mobility. At that time, two steps led up to the entrance of F–101. Neither Jeffries nor Sept inquired about a ramp before moving in. Sept alleges that she asked Defendants to install a ramp shortly after she moved in, but the request was denied. Sept Aff., Pltf Ex. 23, at ¶ 4. By May 1996, Jeffries was using a wheelchair to aid her mobility. Sept alleges that, on

two occasions, Wildflower employees assisted Jeffries by lifting her up the two steps into her apartment. Sept. Aff., Pltf. Ex. 23, at ¶ 8. Sept again requested a ramp in June 1996, and the request was again denied. *Id.* at ¶ 6.

Sept then contacted Summit Independent Living Center and Montana Fair Housing for help. Summit installed a temporary ramp, and Montana Fair Housing investigated Wildflower's ownership. On August 30, 1996, Montana Fair Housing advised Ray Terry and American Property Development, Inc., that the steps leading up to F–101 violated fair housing laws. Pltf Ex. 1, p. 3. Defendants allege that neither Sept nor Jeffries requested a ramp until August 1996, at which time Wildflower's on-site manager, Kelly Egan, arranged installation of a ramp. In October 1996, an independent contractor working for Defendants installed a permanent ramp at F–101. Because the slope was greater than Architect Terry planned to use in the event a ramp was requested, he added handrails. Terry Aff. ¶ 14.

In June 1996, Bill Chatterton applied for an apartment at Wildflower. Chatterton is quadriplegic and uses a wheelchair. At the time he applied, he asked that the available unit be modified for better accessibility. He offered to pay for the modification. Because he did not meet income guidelines, Wildflower denied his application. Pltf Ex. 1 at 3.

In June and July of 1997, Sept, Chatterton, Summit and Montana Fair Housing filed complaints with the State of Montana and with HUD, alleged Wildflower discriminated against disabled persons by failing to comply with fair housing laws in its design and by failing to correct those deficiencies. American Property Development and American Property Management admitted that they made all decisions regarding the design, construction, and operation of Wildflower. Defendants maintained that apartment entrances at Wildflower were designed to be readily adaptable to a ramp if a tenant ever needed one and that they would modify apartments only if a tenant required it.

In September 1997, a state human rights investigator inspected Wildflower. Among the violations the investigator listed were steps before the entrances to 34 of 48 ground-floor apartments, inaccessible laundry facilities and playground, doors without levered or U-shaped handles, and inaccessible environmental controls. In July 1998, when Montana Fair Housing conducted a follow-up inspection, none of these conditions had changed. On September 14, 1998, this lawsuit was filed.

In January 1999, Defendants told this Court that they would remedy the accessibility problems on the ground floor by adding ramps to make "each unit fully accessible." Defendants stated "The changes will be made and should not be an issue in this case." Defendants' Prediscovery Disclosures at 3–4. Defendants also admitted that environmental controls must be accessible, i.e., placed between 15″ and 48″ off the floor. They claimed to have an adapter for air conditioning controls and for electrical outlets that could be installed in thirty minutes. *Id.* at 5–6. Defendants stated that they had obtained the appropriate door handles, installed one front-loading washer/dryer in the laundry, and intended to provide an accessible path to Wildflower's play area. *Id.* at 4–5.

By May 1999, a majority of the ground floor entrances were still blocked by stairs. Ground-floor units had twist-type doorknobs. The play area, surrounded by railroad ties, remained inaccessible.

Defendants opine that they had "indicated their willingness to address the issues raised in the complaint and ... invited plaintiffs to engage in discussions with them for the very purpose of resolving the site conditions alleged by plaintiffs and discussing how the accessibility and usability of the properties could be enhanced further." Defendants' Brief at 2. Defendants further alleged that Plaintiffs "[r]eject[ed] this cooperative approach" by fil-

ing the instant brief for partial summary judgment on July 2, 1999. Montana Fair Housing asserts that, as of July 2, 1999, persons with disabilities who use wheelchairs still cannot conveniently access Wildflower Apartments.

For purposes of this motion, Plaintiffs focus on four site conditions that they allege indicate noncompliance with fair housing laws:

- failure to provide to 34 of 48 ground-floor apartments at least one accessible entrance on an accessible route;
- placement of environmental controls at 60–63 inches above the floor, significantly higher than the 48–inch maximum height allowed by law, and placement of electrical outlets at 14 ½ inches above the floor, ½ inch less than the minimum height allowed by law;
- use of twist-type doorknobs rather than levered or U-shaped handles; and
- failure to provide front-loading washer/dryer units, failure to provide doors with low pulling force and safe sweep periods in the laundry, and failure to provide access to the Wildflower play area.

During her inspection of Wildflower, the investigator for the Montana Human Rights Commission identified these same conditions, among others, as violating fair housing laws.

### Summary of the Parties' Arguments

Defendants argue that summary judgment must be denied on several grounds. First, the statute of limitations expired as to the claims of Betty Sept. Second, Plaintiff Bill Chatterton has no standing because he exceeded the income limits for residency at Wildflower. Third, the regulations governing the construction of new housing were too vague to warrant an award of punitive damages. Fourth, Wildflower was designed so as to be readily adaptable to the needs of disabled persons, so no violations occurred. Fifth, as to the

height of electrical outlets, 14 ½ inches is within the range of field conditions when the target range is between 15 and 48 inches. Sixth, only those defendants who both design and construct housing for first occupancy after March 1991, can be held jointly and severally liable. Under this argument, Defendants American Property Development, Inc., Ray Terry, American Property Management, Inc., may not be held liable for violations propounded by the other entities and individuals. Additionally, Defendants argue that only those defendants who actively participated in and controlled the alleged violations can be held liable; this argument would exclude American Property Management, Inc., from liability. Seventh, punitive damages are inappropriate because Defendants did not intentionally violate or recklessly disregard the requirements of the Fair Housing Act and because punitive damages are not available under the Montana Human Rights Act.

Plaintiffs respond, first, that the statute of limitations did not expire, because the continuing violations doctrine pushes the date on which the statute began to run up to the date on which the violations were corrected. Second, Plaintiff Bill Chatterton need not meet the income requirements in order to state a claim under fair housing legislation because he has standing as a disabled person who attempted to access Wildflower. Third, the regulations were not vague. Fourth, design for later adaptation does not meet the requirements of the Fair Housing Act, which contains specific mandates to be followed for housing intended for first occupancy after March, 1991. Fifth, there is no field conditions defense under the Fair Housing Act. Sixth, judicial interpretation of the phrase "design and construct" has, over time, tended in the direction of disjunctive, rather than conjunctive, construction, so each of the Defendants may be held liable. Seventh, the punitive damages claim is brought under the Fair Housing Act and under an earlier version of the Montana Human Rights Act that does provide puni-

tive damages, and the undisputed evidence shows that the Defendants did recklessly disregard the law.

## Analysis

### I. Statute of Limitations

#### A. Fair Housing Act and Montana Human Rights Act

Both 42 U.S.C. § 3613(a)(1)(A) and Mont.Code Ann. § 49–2–510(5)(a) set a two-year statute of limitations on civil rights claims based on fair housing laws. Plaintiffs filed an administrative complaint with HUD and the Human Rights Division of the Montana Bureau of Labor and Industry on June 23, 1997, tolling the statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(B). The HUD complaint is still pending.

Defendants argue that the limitations period begins to run when the alleged discriminatory act occurs, even though the effects may not be felt until a later date. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (holding that statute of limitation began running in Title VII employment action when tenure was allegedly wrongfully denied, not when employee was discharged one year later). They argue that the statute of limitations as to Betty Sept began running in April 1994, when she and her mother, Maude Jeffries, moved in to Unit F–101. At that time, the stairs leading up to the entrance, the twist-type doorknobs, the placement of environmental controls, the railroad ties around the play area, and the top-loading washing machines were apparent.

In response, Plaintiffs point to the statute. 42 U.S.C. § 3613(a)(1)(A) provides "[a]n aggrieved person may commence a civil action . . . no later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last." Pub.L. No. 100–430, adding the phrase "or the termination . . . whichever occurs last," confirmed application of the continuing violations doctrine in fair housing cases. *See*

H.R.Rep. No. 711, 100th Cong., 2d Sess., 18, 22 (June 17, 1988), *reprinted at* 1988 U.S.C.C.A.N. 2173. Under *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the continuing violations doctrine requires that at least one incident of discrimination must fall within the statute of limitations period. The pivotal date is thus the date of the last alleged violation. Though Plaintiffs claim the violations continue today, they say a "cure" undoubtedly occurred in October 1996, when a ramp was installed outside Unit F–101. Even if October 1996 were the date the limitations period commenced, Sept's filing of the administrative complaint is well within the statute of limitations.

■ Plaintiffs are correct. The statute is clear. The limitations period did not begin to run on the date Betty Sept moved in, April 1994, but, at the earliest, in October 1996, when a ramp was finally installed outside her apartment.

#### B. Breach of Covenant

■ Sept also brought a claim for breach of covenant. The applicable statute of limitations on that cause of action is eight years. *See* Mont.Code Ann. § 27–2–202. Unless the covenants themselves provide a definite and readily determinable time frame, the limitations period does not begin to run until there has been a demand for performance. *Country Estates Homeowners Assoc. v. McMillan,* 276 Mont. 100, 103, 915 P.2d 806, 808 (Mont. 1996). Although there is a conflict in the evidence regarding the date Defendants first received a demand for performance, it is not a material conflict. Sept claims she first requested a ramp when she moved in to Unit F–101, in April 1994. Defendants claim they did not receive a demand for performance until August 1996. Assuming the Defendants are correct, the statute does not expire until August 2002.

## II. Standing

Defendants challenge Plaintiff Bill Chatterton's standing. Chatterton, they argue, did not meet the income limits for low-income housing. For that reason, he was not injured by being denied housing at Wildflower.

Plaintiffs reply that Wildflower's construction inhibited Chatterton's ability to visit and associate with Wildflower residents. Consequently, he was denied " 'the important social and economic benefits' which derive from living in an integrated community." Plaintiff relies on *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 376, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 208, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

These cases establish that a plaintiff need not be a member of the protected class and need not suffer the specific injury that the statute seeks to avoid. However, they do not eliminate the standing requirement altogether. A plaintiff must still show the some harm resulted from the defendant's acts or omissions. "[T]o establish standing under the Act, all [plaintiffs] need show is that the [defendant] interfered with … housing rights … and that, as a result, the [plaintiffs] suffered an actual injury." *San Pedro Hotel v. City of Los Angeles,* 159 F.3d 470, 475 (9th Cir. 1998) (recognizing that plaintiffs who sought to sell a hotel for use as a group home for the mentally ill had standing to assert a claim under the Fair Housing Act for defendant city's refusal to approve the proposed use).

The evidence supporting Chatterton's standing is disputed. Defendants' affidavits state that Chatterton had expressed interest in modifying one of the available units but ultimately had too high an income to qualify for residence at Wildflower. Habein Aff. ¶ 4, Exs. A, B; Stevens Aff. ¶¶ 7–8. Chatterton alleges that he was denied because of the modifications he requested. Pltfs' Ex. 26 at ¶ 5. However, his affidavit refers only to his application to Wildflower, not to any frustrated attempts to visit someone there. *See* Pltfs' Ex. 26 at ¶ 7. Chatterton need not be a tenant to have standing, but he does have to show that he attempted to gain access and could not. Assuming Wildflower denied his application because of his income, his affidavit does not show that Defendants' violations caused him any other actual injury sufficient to give him standing. Chatterton, therefore, is not entitled to judgment as a matter of law.

## III. Vagueness & Ambiguity of the Fair Housing Act Requirements

Defendants contend that they did not violate the Fair Housing Act because Wildflower's design complies with plausible interpretations of the Act's requirements. First, they argue that the term "adaptive design," in 42 U.S.C. § 3604(f)(3)(C)(iii), is ambiguous. Next, defendants contend that the ground floor access routes, placement of environmental controls, the doorknob hardware, and the common areas either comply with plausible interpretations of the Act or could not be brought into compliance because the requirements were unclear.

### A. "Adaptive Design"

Following the unsuccessful defendants in *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.,* 40 F.Supp.2d 700 (D.Md.1999) (*BN II*), Defendants argue that the term "adaptive design," as used in 42 U.S.C. § 3604(f)(3)(C)(iii), is ambiguous.

Here, in relevant part, is the statute, with the term in question emphasized:

(3) For purposes of this subsection, discrimination includes …

(C) in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, [March 13, 1991] a fail-

ure to design and construct those dwellings in such a manner that—

(i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

(ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(iii) all premises within such dwellings contain the following features of *adaptive design:*

(I) an accessible route into and through the dwelling;

(II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(III) reinforcements in bathroom walls to allow later installation of grab bars; and

(IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

Defendants argue that, in context, the phrase "adaptive design" may mean that the listed features must be present in any new construction, or it may mean that new construction must ensure that the listed features can be included at a later date. Defendants point out that Congress could have said "all premises within such dwellings [shall] contain the following features." Cutting off the phrase at "features" would make it clear that all new construction must contain the listed features. Because Congress chose not to do that, it must have intended that construction only be suited for adaptation to accessibility requirements at a later time. Defendants also cite a comment made by a disability rights organization during hearings on the Fair Housing Act: "Some building industry people have thought that an adaptable unit was a standard unit that would be remodeled if a disabled person wanted to move in and required certain accessible

features." *BN II,* 40 F.Supp.2d at 708 (quoting Barrier Free Environments, Inc., Department of Housing and Urban Development Office of Policy Development and Research, "Adaptable Housing" at 8 (1987)). Defendants use this comment to demonstrate that it reasonably interpreted "adaptable design" to refer to the possibility of future remodeling.

Plaintiffs reply that the phrase is not ambiguous in the first place, and that, even if it was, the regulations HUD promulgated between 1988 and 1991 conclusively showed that "adaptable design" was a term of art, meaning design appropriate for use by persons of all abilities without modification.

■ Plaintiffs have the better argument. Defendants' own blueprints contain the following "Accessibility Compliance Statement":

All living units on the ground floor at level entrances and patio doors shall have thresholds with a maximum rise of 1/2″.

In compliance with the Federal "Fair Housing Amendments Act" of 1988, the living units will include the following:

—usable doors (32″ clear width)

—accessible route into and through the unit

—reinforced walls for grab bars

—usable kitchens and bathrooms

I note that this statement does not include the purportedly ambiguous phrase "adaptive design." The architect's Accessibility Compliance Statement gives no indication that he believed "adaptive design" to mean design for later adaptability. He stated that the living units "will include" accessible routes. It is not difficult to understand that a route into and through the unit is not accessible if it is preceded by two steps. Moreover, the architect's list excludes any mention of the placement of light switches, electrical outlets, and environmental controls, although it demon-

strates a keen comprehension of 42 U.S.C. § 3604(f)(3)(C)(iii)(I), (III), and (IV).

Defendants cannot be relieved of liability on the grounds that they did not understand the law.

### B. Site Characteristics & Defendants' Compliance

Next, Defendants contend that the ground floor access routes, placement of environmental controls, the doorknob hardware, and the common areas either comply with plausible interpretations of the Act or need not be brought into compliance because the requirements do not extend to all of the site conditions Plaintiffs focus on.

#### 1. Accessible routes to ground floor units

Defendants argue that not all of the ground floor units at Wildflower must be accessible because the Fair Housing Accessibility Guidelines contain exceptions for site impracticality. The exception extends to sites located on flood plains. 56 Fed.Reg. 9472, 9504 (March 6, 1991). For sites located on flood plains, buildings with a finished grade elevation of more than 30 inches and 10%, measured between a unit entrance and arrival points within 50 feet of it, need not be constructed with accessible entrances. Defendants point out that Wildflower is situated on a 100–year flood plain. Therefore, those buildings at Wildflower that feature a 30–inch finished grade elevation between their entrances and the associated arrival points need not be accessible. Defendants state that at least five of the twelve buildings at Wildflower meet this criterion.

Plaintiffs call the Court's attention to the recent development of this argument and maintain that accessible entrances were not constructed at the remaining seven Wildflower buildings. Plaintiffs also point out that Wildflower designed accessible routes to all the ground floor units after suit was filed in this Court. Finally, Plaintiffs state that site impracticality is an affirmative defense found in HUD's regulations and not in the statute. It must therefore be strictly construed against those asserting it. Under that rule, Defendants' failure to offer evidence that the difference in finished grade elevation also exceeds 10% should be taken as an admission that it does not. Nothing prevented Defendants from obtaining that measure and including it in architect Ray Terry's affidavit.

As an alternative line of reasoning, Plaintiffs propose that HUD overstepped its authority in formulating a site impracticality defense. See Sutton v. United Air Lines, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (ignoring EEOC and DOJ interpretation of "disabled" where ADA and legislative history provided clear meaning); see also Chevron v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (administrative regulations are deferred to only if governing statute is ambiguous).

■ Plaintiffs prevail. The site impracticality defense is mooted by its inapplicability to seven of the twelve buildings.

#### 2. Environmental Controls

##### a. Thermostats

Defendants concede that thermostats were installed more than 48 inches above the finished floor.

##### b. Air Conditioning Controls

Defendants claim that air conditioning controls need not be accessible in Montana because no one in Montana really needs air conditioning. They cite HUD's interpretation of "other environmental controls": "those environmental controls that are used by residents or tenants on a regular or daily basis." 56 Fed.Reg. 9472, 9490 (March 6, 1991). To the contrary, HUD specifically included air conditioning in "other environmental controls" in its Guidelines:

[T]he Act specifically identifies "thermostats" as one of the controls that must be in accessible locations, and the mounting heights specified in the Guidelines are necessary for an accessible location. The only other environmental controls covered by the Guidelines for Requirement 5 would be heating, air conditioning or ventilation controls (e.g., ceiling fan controls). The Department interprets the Act's requirement of placing environmental controls in accessible locations as referring to those environmental controls that are used by residents or tenants on a daily or regular basis. Circuit breakers do not fall into this category, and therefore are not subject to accessible location specifications. Light and fan switches on range hoods are appliance controls and therefore are not covered by the Act.

56 Fed.Reg. 9472, 9490 (March 6, 1991).

Defendants also argue that the air conditioning units at Wildflower are individual units, more like appliances, with the controls situated on each individual unit. The positioning of the units, Defendants argue, is based on performance optimization. They argue that the unit must be placed so as to prevent furniture being placed in front of it and inhibiting its efficient operation.

 I have not found a performance-optimization exception in the Fair Housing Act. Defendants are correct that the Act does not extend to appliances. However, Defendants exerted exclusive control over the parameters within which air conditioners must fit. The structural aspects of that decision do fall within the Act. If a kitchen were designed so that a microwave could be installed only over the stove, the kitchen would not seem to meet the "adaptive design" requirement. Reasoning by that analogy, the placement of air conditioning controls is substantially within Defendants' control.

### 3. Electrical Outlets

In their brief, Defendants assert that summary judgment cannot be grounded on the placement of electrical outlets because the Montana Human Rights inspector did not note any problem with them. Only Pam Bean, an employee of Montana Fair Housing, measured the outlets at 13 to 14 ½ inches. This conflict in the evidence precludes judgment as a matter of law. At oral argument, however, Defendants conceded the outlets were in fact located approximately 14 ½ inches above the finished floor.

### 4. Twist-type Doorknobs

Defendant argues that it cannot be held liable for failing to install lever-type or U-shaped door handles given the "clear ambiguity" of the term "adaptive design." I have already dispensed with the ambiguity argument. Defendants offer no other argument which would preclude summary judgment against them.

### 5. Public and Common Use Areas

Plaintiffs claim that the railroad ties surrounding the play area, doors with pulling force and closing periods beyond the ANSI limits, and the top-loading washer/dryer units in the laundry violate the Act's requirements.

Defendants argue that they provided a front-loading washer/dryer in December 1998 and that, in any case, a third-party lessee is responsible for maintaining the laundry. Plaintiffs' evidence is incompetent with respect to the doors, because the Montana Human Rights inspector did not measure the pulling force or sweep period. Finally, Defendants argue that "[t]he design and construction of a child's play area present unique issues that must be balanced against the need to make such areas accessible and yet safe for all children." Defts' Brief at 17.

 Defendants prevail as to the pulling force and sweep period of the doors in public and common use areas. Although

Defendants could have measured the force and sweep themselves, an inspector's conclusory statement is not sufficient to ground summary judgment.

■ Nonetheless, the argument against making the play area accessible is specious. Plaintiffs do not claim that the entire area must be redesigned. They merely complain that persons in wheelchairs cannot get in to the play area because it is surrounded by railroad ties. All Defendants would have to do is remove a few of the ties.

■ As to the third-party lessee argument, Defendants did not cite any law in support of their argument that the presence of a third-party lessee absolves them of liability under the Fair Housing Act or the Montana Human Rights Act. Plaintiffs cite the bedrock principle that the duty not to discriminate is nondelegable. *See, e.g., Fair Housing Congress v. Weber,* 993 F.Supp. 1286, 1294 (C.D.Cal.1997) (holding landlord responsible for apartment managers' discrimination); *Phiffer v. Proud Parrot Motor Hotel,* Inc., 648 F.2d 548, 552 (9th Cir.1980) (same). I see no principled reason to distinguish between landlords who seek to delegate their duty not to discriminate to apartment managers and landlords who seek to delegate their duty not to discriminate to laundry operators. Thus, Plaintiffs carry the argument on this point.

## IV. Defendants' Liability

" 'Design and construct' is a broad sweep of liability, [encompassing] architects, builders, and planners." *United States v. Days Inns of America, Inc.,* 997 F.Supp. 1080, 1083 (C.D.Ill.1998) (holding national hotel franchise liable for failure to design and construct new hotel in compliance with ADA, despite franchise's limited involvement). *See also United States v. Ellerbe Becket, Inc.,* 976 F.Supp. 1262 (D.Minn.1997) (holding architectural firm liable for ADA violations despite fact that it was not the owner, operator, lessor, or lessee of any of the facilities it designed); *accord Johanson v. Huizenga Holdings, Inc.,* 963 F.Supp. 1175 (S.D.Fla.1997) (Ellerbe Becket was also a defendant in this case). In *Ellerbe Becket,* the defendant architectural firm urged the district court to accept a strict reading of the phrase "design and construct," knowing that it would thereby escape liability because architectural firms, by definition, only design buildings. This argument prevailed in *Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers,* 945 F.Supp. 1 (D.D.C.1996). Even in that decision, however, the court implicitly concluded that general contractors—who, after all, only construct buildings—could be held liable. There was no appeal of that issue.

In *Paralyzed Veterans,* the district court held:

> If entities who are responsible for both design and construction can be held liable for violations of the ADA, those entities will ensure that the firms or individuals with whom they contract—experts in design or construction—will hew to the dictates of the statute and regulations. If a violation is nonetheless alleged, interested parties with standing may seek effective relief by naming as defendants the high-level entities responsible for both design and construction, as the remaining defendants in this case are aware.

945 F.Supp. at 2.

The present scenario is designed to defeat this goal. Defendants argue that American Property Development, Inc., and Ray Terry only designed Wildflower, and American Property Management, Inc., only manages it. Property Management and Supply, Inc., now known as American Home Builders, Inc., and the owners, Wildflower Associates, were actively involved in both design and construction. American Capital Development, Inc., is Wildflower Associates' general partner. Roger Kuula and Jon Wood are behind each of these corporate veils. Essentially,

the same people designed, constructed, manage, and continue to profit from Wildflower's low-income tax credits, but the entities defray responsibility.

█ A recent case, *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F.Supp.2d 661 (D.Md.1998) (*BN I*), held that "the design and construction language ... should be read broadly. When a group of entities enters into the design and construction of a covered dwelling, all participants in the process as a whole are bound to follow the FHA.... In essence, any entity who contributes to a violation of the FHA would be liable." *Id.* at 665. This is the better approach. Nothing in the legislative history supports the Defendants' wooden reading of "design and construct," and the purpose of the Act is better fulfilled by a disjunctive reading.

## V. Punitive Damages

Finally, Plaintiffs move for summary judgment as to Defendants' potential liability for punitive damages. They point to a seven-year course of conduct, beginning with Wildflower's initial noncompliant design in 1992 and continuing through its construction and its current operation.

Defendants argue they did not knowingly violate the Fair Housing Act because its ambiguities prevented their compliance. They also argue that they have diligently attempted to bring Wildflower into compliance. They state that Plaintiffs cannot obtain punitive damages under the Montana Human Rights Act.

As preliminary matters, Plaintiffs are correct that they may obtain punitive damages under the Montana Human Rights Act. The administrative complaint in this case was filed before the 1997 amendments, which foreclosed punitive damages, went into effect.

I have already determined that the ambiguity of the law did not prevent Defendants from complying with it.

█ However, Plaintiffs seek a ruling that they may present their argument on punitive damages to the jury. I cannot make that determination at this point. If the evidence presented at trial supports a punitive damages argument, Plaintiffs may make the argument; if not, they may not. Additionally, the question whether Defendants diligently attempted to bring Wildflower into compliance after its initial noncompliance is a question for the jury.

## VI. Conclusion

Plaintiffs Betty Sept, Summit Independent Living Center, Inc., and Montana Fair Housing, Inc., are entitled to partial summary judgment on the grounds that inaccessible ground-floor entrances, placement of all environmental controls and electrical outlets, use of twist-type doorknobs rather than levers or U-shaped handles, installation of only top-loading washer/dryer units, and the use of railroad ties around the play area violated the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C), and the Montana Human Rights Act, Mont.Code Ann. § 49–2–305(5)(c)(i). Plaintiff Bill Chatterton is not entitled to summary judgment because he lacks standing. Plaintiffs are not entitled to partial summary judgment as to the pulling force and sweep of the laundry-room doors because the evidence is not competent to establish the doors' actual force and sweep.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs motion for summary judgment (dkt # 25) is GRANTED as to Plaintiffs Betty Sept, Montana Fair Housing, Inc., and Summit Independent Living Center, Inc.

IT IS FURTHER ORDERED that Plaintiff Bill Chatterton's claims as to inaccessible ground-floor entrances, placement of all environmental controls and electrical outlets, use of twist-type doorknobs rather than levers or U-shaped handles, installation of only top-loading washer/dryer units, and use of railroad ties around the play area, insofar as those claims are based on

the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C), and the Montana Human Rights Act, Mont.Code Ann. § 49–2–305(5)(c)(i), are DISMISSED without prejudice on the grounds that Plaintiff Chatterton lacks standing to assert them.

IT IS FURTHER ORDERED that this Order does not constitute a full adjudication of the case. *See* Fed.R.Civ.P. 56(d).