**File Name: 06a0900n.06**
**Filed: December 15, 2006**

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 05-5862**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FAIR HOUSING COUNCIL, Inc., et al., | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiffs-Appellees, | ) | COURT FOR THE |
| | ) | WESTERN DISTRICT OF |
| v. | ) | KENTUCKY |
| | ) | (No. 3:98-CV-00630) |
| VILLAGE OF OLDE ST. ANDREWS, Inc., et al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE:    RYAN, COOK, Circuit Judges; and GWIN, District Judge.[*]

Gwin, District Judge,

   Plaintiffs Fair Housing Council and Center for Accessible Living allege that the Defendants,

the Village of Olde St. Andrews, Inc., WKB Associates, Inc., and Kenneth R. Brown, engaged in

_____

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

-1-

disability discrimination in their design and construction of multifamily residential developments. In support of this allegation, the Plaintiffs say the Defendants designed and constructed residences that were not accessible to handicapped persons as required by the Fair Housing Amendments Act of 1988 ("Fair Housing Act").

After trial, the district court concluded that Defendants engaged in unlawful discrimination and ordered the Defendants to perform remedial construction on the developments. Defendant WKB appeals, arguing that (1) the Plaintiffs lack standing to sue, (2) even if the Plaintiffs had standing, the applicable statute of limitations bars their claim, and (3) that the district court committed error in failing to allow the Defendant to demonstrate compliance by other means than those set forth by the HUD guidelines. 44 Fed. Reg. at 9472-9515. For the reasons that follow, we **AFFIRM** in part and **REVERSE** in part the decision of the district court.

## I.     Background

The Plaintiff Fair Housing Council operates as a nonprofit corporation to promote equal housing availability for, among others, disabled individuals. The Center for Accessible Living is a nonprofit corporation that advocates independent living for disabled people.

The Defendant-Appellant WKB is a Kentucky corporation that builds real estate developments, principally in Louisville, Kentucky . Between 1993 and 2001, WKB constructed the three multifamily housing developments at issue in this case. Those developments include the Village of Olde St. Andrews, the Village of Deer Creek, and Greenhurst Condominiums.

After its construction, the Fair Housing Council observed steps leading to the residences at the Defendant Village of Olde St. Andrews that it believed violated the Fair Housing Act.

Thereafter, the Fair Housing Council employed disabled individuals to enter and inspect the property for Fair Housing Act violations. The Center for Accessible Living provided these "testers" and the Fair Housing Council trained, paid, and debriefed them. After identifying a number of potential violations, the Fair Housing Council and the Center for Accessible Living sued Olde St. Andrews, WKB, and the development's architect, Kenneth Brown. Plaintiffs later added claims against the Greenhurst Condominiums and the Village of Deer Creek, two other complexes designed by Brown and owned by WKG. Before trial, Brown settled the claims made against him.

In motions for summary judgment, the Defendants argued that Plaintiffs lacked standing to sue and that the statute of limitations stopped the claims as against Greenhurst. Additionally, the Defendants argued that they should have had the opportunity to demonstrate compliance with the Fair Housing Act by means other than those provided by the HUD guidelines. The district court denied summary judgment, finding that Sixth Circuit precedent gave standing. After a bench trial resulted in a decision for Plaintiffs, WKB appealed.

With its appeal, the Defendant argues that the district court erred in holding that Plaintiffs had standing to sue, that the statute of limitations barred Plaintiffs' claims in part, and that the district court overly deferred to HUD's building guidelines. We now consider these arguments.

II.     Standard of Review

We review a district court's denial of summary judgment *de novo*. *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 565 (6th Cir. 2005). Summary judgment is only appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). In seeking summary

judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

## III. Discussion

With this appeal, Defendant-Appellant WKB argues that the district court erred in finding that the Plaintiffs have standing and erred when it found that the statute of limitations does not bar the Plaintiffs' claims. Additionally, the Defendants argue that the district court afforded inappropriate deference to the HUD guidelines when determining whether or not WKB's housing developments complied with the Fair Housing Act. We address each argument below.

### A. Standing

Article III of the United States Constitution limits the jurisdiction of this Court. Specifically, Article III § 2 confers federal jurisdiction over "cases" and "controversies." Standing is an important element of the case or controversy requirement. To demonstrate standing under Article III, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). *See also Raines v. Byrd*, 521 U.S. 811, 818-19 (1997).

Typically, the standing inquiry does not end with the Article III requirements. Instead, even

where a plaintiff can show that its case falls within these constitutional bounds, the plaintiff must also overcome prudential barriers on the exercise of federal jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). However, because prudential limitations on jurisdiction are judicially self-imposed rather than constitutionally mandated, Congress has the power to waive prudential barriers by statute. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one 'who otherwise would be barred by prudential standing rules.'") (quoting *Warth*, 422 U.S. at 501). With regard to the Fair Housing Act, Congress has made a decision to afford standing to all litigants within the Constitutional limits. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n. 9 (1979). As a result, the plaintiffs in the instant case need only satisfy Article III requirements in order to demonstrate standing.

1.      *Circuit Court's Power to Review Standing Issue*

As an initial matter, the Plaintiffs argue that denial of summary judgment is not appealable where, as in the instant case, "summary judgment is denied and the movant subsequently loses after a full trial on the merits  . . . " *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990) (citing *Locricchio v. Legal Services Corp.*, 833 F.2d 1352 (9th Cir. 1987); *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564 (Fed. Cir. 1986)). In *Jarrett*, 896 F.2d at 1016 n. 1, we found that despite the harm that may flow from allowing a wrongful denial of summary judgment to go unreviewed, "it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgement motion demonstrated the need for a trial."

Recognizing that this policy rational does not always apply, we have subsequently carved out exceptions to the general rule. For example, in *McPherson v. Kelsey*, we held that a movant can appeal the denial of summary judgment even after losing a trial on the merits where the issue on appeal is purely one of law, such as governmental immunity. 125 F.3d 989, 995 (6th Cir. 1997). Other circuits have recognized similar exceptions. *See Banuelos v. Const. Laborers' Trust Funds*, 382 F.3d 897, 902 (9th Cir. 2004) ("This general rule, however, does not apply to those denials of summary judgment motions where the district court made an error of law that, if not made, would have required the district court to grant the motion."); *Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005) (reviewing a district court's denial of the government's motion for summary judgment for lack of standing even after a final judgment on the merits was entered for the plaintiffs).

We find, however, that there is no need for us to now determine whether or not we may appropriately review the district court's denial of Defendant WKB's motion for summary judgment with regard to the issue of standing. This court may always address the issue of standing, irregardless of the lower court's treatment of that issue. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'") (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

   2.      *Whether the District Court Erred in Determining the Plaintiffs had Standing*

Defendant WKB argues that the Plaintiffs lack standing to sue because the Plaintiffs fail to demonstrate any injury independent of the instant litigation that is fairly traceable to the allegedly

discriminatory actions of the Defendants. Responding, the Plaintiffs claim that their investigation into disability discrimination at the WKB properties caused them to divert substantial institutional resources from other projects or standard activities.

Addressing these arguments on summary judgment, the district court found that the Plaintiffs failed to present sufficient evidence to support their claim that they were forced to divert funds for the WKB investigation to the detriment of other projects. However, applying this Circuit's decision in *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993)[1], the district court reluctantly found that the Plaintiffs' prelitigation investigation expenses related to the three testers that the Fair Housing Council sent to the WKB properties were sufficient to confer standing. Defendant WKB now argues that we should overturn *Hooker*. In the alternative, WKB claims that *Hooker* is fairly distinguishable from the instant case and that even under the *Hooker*, the Plaintiffs lack standing.

### a. Organizational Standing Under the Fair Housing Act

The United States Supreme Court dealt with the issue of organizational standing under the Fair Housing Act in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In that case, a fair housing organization brought suit against a realty corporation, alleging "racial steering" in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3604. In its complaint, the fair housing organization,

---

[1]Therefore, FHCS "can establish standing by alleging a concrete and demonstrable injury, including an injury arising from a 'purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action.' " Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644, 646 (6th Cir.1991) (quoting Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C.Cir.), cert. denied,498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990)). According to the complaint, "Fair Housing Contact Service conducted an investigation, and confirmed the facts and circumstances alleged [in the complaint]." FHCS devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status. Therefore, FHCS has standing."

*Hooker v. Weathers,* 990 F.2d 913 at 915 (6th Cir. 1993).

HOME, alleged that it had "been frustrated by defendant's racial steering practices in its efforts to assist equal access to housing through counseling and other referral services . . . [and] had to devote significant resources to identify and counteract the defendant's [sic ] racially discriminatory steering practices." *Id*. at 378. Arguing that HOME lacked standing, the defendant moved to dismiss. The district court granted the motion, finding that HOME failed to allege a direct injury sufficient to confer standing. The Supreme Court reversed and held that the dismissal was wrong, stating:

> [i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities--with the consequent drain on the organization's resources--constitutes far more than simply a setback to the organization's abstract social interests . . ..

*Id*. at 379.

Interpreting *Havens*, the circuit courts have reached varying conclusions about the showing that an organization must make to demonstrate standing under the Fair Housing Act. Before highlighting the different approaches, we first note that the circuits generally agree that an organization meets Article III standing requirements where it can show that the defendant's alleged violations of the Fair Housing Act caused it to divert resources from other projects or devote additional resources to a particular project in order to combat the alleged discrimination. *See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3rd Cir. 1998) ("In deciding organizational standing questions after *Havens*, appellate courts have generally agreed that where an organization alleges or is able to show – depending on the stage of the proceeding – that it has devoted additional resources to some area of its effort in order to counteract

discrimination, the organization has met the Article III standing requirement.").

The circuit courts differ, however, on the extent to which they will consider injury related to litigation in reviewing standing.   Several courts have taken a more restrictive approach, holding that to show standing, an organization must demonstrate that it suffered a concrete injury that is completely independent from the economic and non-economic costs of the litigation.[2]  *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation."); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 79 (3rd Cir. 1998) ("We align ourselves with those courts holding that litigation expenses alone do not constitute damage sufficient to support standing.")*; Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) (declining to consider "the time and money the [housing organization] has expended in prosecuting this suit" in deciding if the organization had standing). While following the restrictive approach, the Third Circuit has considered litigation expenses when

---

[2]In these cases, the courts have found standing where the defendant's discriminatory actions forced the plaintiff organization to expend resources apart from those dedicated to the litigation, such as where an organization poured additional funds and manpower into a broad education initiative to combat the discrimination.  *See Spann*, 899 F.2d at 27-28 (organization demonstrated that the defendant's racially discriminatory advertising forced it to expend additional resources to educate the community about housing discrimination and counsel individuals facing such discrimination).

concluding that an organization had standing where the organization "stopped everything else" in order to devote attention to the lawsuit. *Alexander v. Riga*, 208 F.3d 419, 427 n. 4 (3rd Cir. 2000).

Other circuits take a more lenient approach, allowing organizations to prove standing by showing that they diverted resources toward litigation to counteract the defendant's housing discrimination. For example, in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990), the Seventh Circuit held "that only injury which needs be shown to confer standing on a fair housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." There, the Court reasoned that the mere fact that the organization lost the opportunity to provide additional or increased counseling because it had directed its resources toward the lawsuit constituted a cognizable injury. *Id. See also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2nd Cir. 1993) (finding that the plaintiff housing organization had standing based primarily on the significant resources the organization had to devote to investigating the defendant's alleged discriminatory actions and challenging these actions through litigation); *Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd. Co.*, 160 F.3d 433, 434-35 (8th Cir. 1998) ("While the deflection of an organization's monetary and human resources from counseling or educational programs to legal efforts aimed at combating discrimination, such as monitoring and investigation, is itself sufficient to constitute an actual injury, the injury must also be traceable to some act of the defendant.") (internal citations omitted).

The Sixth Circuit falls into the latter group, taking a similarly lenient approach. Though we require a plaintiff to show some injury that is independent of the costs of litigation, we have interpreted that standard narrowly, finding that costs related to prelitigation investigation can form

the basis for standing. *See Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991); *Hooker*, 990 F.2d at 915.

In *Housing Opportunities*, 943 F.2d at 646, a housing organization sued a local newspaper, alleging that the paper published discriminatory housing advertisements in violation of the Fair Housing Act. Briefly discussing the issue of standing, the *Housing Opportunities* Court cited the standard set forth in *Spann*, generally requiring the plaintiff to demonstrate "injury, *including* an injury arising from a 'purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action.'" *Id.* (quoting *Spann*, 899 F.2d at 27) (emphasis added). In *Housing Opportunities*, the plaintiff's devotion of resources to investigate and combat the defendant's discriminatory advertising was found sufficient to confer standing. *Id.* Although not explicitly stated, *Housing Opportunities* suggests that this Court does not preclude consideration of the costs of litigation when determining standing, but additionally requires the plaintiff to prove some type of injury beyond these costs.

We next revisited the issue of organizational standing under the Fair Housing Act in *Hooker*, 990 F.2d at 915. In that case, an individual, Richard Hooker, contacted a local fair housing organization to complain of age discrimination at a local trailer park, alleging that the manager of the trailer park refused to rent or sell trailers to young people or families with children. To investigate the claim, the housing organization sent a tester to the trailer park to inquire about renting a trailer. The manager refused to rent to the tester, telling her that she was too young. Based on this investigation, the housing organization filed suit against the manager of the trailer park. The district court dismissed the suit for lack of standing. On appeal, the *Hooker* Court reversed the dismissal.

Holding that the act of sending a tester to investigate Hooker's claim of discrimination was sufficient to confer standing, the court stated, "FHCS devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status. Therefore, FHCS has standing." *Id*.

Recently, in an unpublished decision, *Hughes v. Peshina*, No. 02-3660, 2004 WL 187550 (6th Cir. 2004), we followed the *Hooker* Court's holding. Just as in *Hooker*, the plaintiff housing organization in *Hughes* followed up on a complaint of discrimination on the basis of familial status by sending a tester to attempt to rent property from the defendants. When the tester faced similar discrimination, the organization filed suit. Finding that the housing organization had "devoted its efforts to investigating whether [the defendants] had violated the law, thus diverting its resources away from the other housing services it provides and frustrating its mission of insuring fair housing practices," the *Hughes* Court found the housing organization had suffered an injury in fact sufficient to confer standing. *Id*.

### b. Reconsidering Hooker

Seeking reversal of the district court's conclusion that Plaintiffs Fair Housing Council and the Center for Accessible Living have standing, Defendant WKB first argues that we should overturn *Hooker*, 990 F.2d at 915. However, this Court must adhere to the well-settled rule that "[r]eported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court en banc consideration is required to overrule a published opinion of the court." 6th Cir. R. 206(c)). *See also Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001); *Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 689 (6th Cir. 1985) ("A

panel of this Court cannot overrule the decision of another panel. The prior decision remains

controlling authority unless an inconsistent decision of the United States Supreme Court requires

modification of the decision or this Court sitting en banc overrules the prior decision."). *Hooker*

therefore remains controlling authority for this panel.

### *c. Do the Plaintiffs Lack Standing Even Under the Hooker Standard?*

Under our Article III standing inquiry, a Plaintiff:

> (1) must have suffered some actual or threatened injury due the to [sic] alleged illegal
> conduct (the "injury in fact element"); (2) the injury must be fairly traceable to the
> challenged action (the "causation element"); and (3) there must be a substantial
> likelihood that the relief requested will redress or prevent [plaintiff]'s injury (the
> "redressability element").

*Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 852 (6th Cir. 2002). The standing

dispute here centers on whether Plaintiffs suffered a cognizable injury in fact. The district court

concluded that the Plaintiffs suffered a sufficiently traceable injury because they incurred monetary

pre-litigation expenses or lost opportunity costs associated with the investigation. Specifically, the

court determined that, under the Sixth Circuit precedent of *Hooker v. Weathers*, 990 F.2d 913, 915

(6th Cir. 1993), such prelitigation costs and expenses conferred Article III standing on the Plaintiffs.

Because we conclude that the Fair Housing Council set forth sufficient evidence to

demonstrate that it suffered an injury that is both independent of the instant litigation and fairly

traceable to the discriminatory actions of the Defendants, we find that Plaintiff Fair Housing Council

had standing to bring this action. In contrast, because the Plaintiff Center for Accessible Living

presents no evidence that they did anything more than identify individuals that might serve as

potential testers, the Court finds that the Center for Accessible Living has not established proof that

it suffered an injury in fact. Accordingly, we find that the Center for Accessible Living does not enjoy standing to make claims in this action.

1.  Fair Housing Council

As discussed above, the *Hooker* Court made clear that an organization suffers a concrete injury sufficient to confer standing when it devotes resources to training and deploying testers to investigate suspected instances of discrimination. The Fair Housing Council suffered precisely this type of injury in the instant case.

Seeking to distinguish *Hooker*, Defendant WKB argues that the Fair Housing Council received a fixed grant from HUD for the purpose of investigating housing discrimination through the use of testers. Defendant WKB argues this receipt of HUD financing for testing differentiates this case.[3] In fact, WKB claims that the HUD funding required the Plaintiff to perform such tests or it would forfeit future funding. However, the mere fact that the Fair Housing Council had already allocated funds for the use of testers, does not mean that the use of a portion of those funds to investigate WKB properties does not amount to a concrete injury.

While this Court has recognized that the diversion of funds from certain activities such as counseling or education can be a sufficient injury to confer standing, it has not required a Plaintiff to demonstrate a redistribution of funds in all cases. For example, the *Hooker* Court found that the mere fact that the plaintiff had devoted resources to investigating the alleged discrimination was

---

[3]The Fair Housing Council's budget narrative work plan covering the time span at issue allocates $7,650 to pay for approximately 255 test visits. (J.A. 289.) The budget does not specify whether of not it can be later amended to reallocate funds.

sufficient – it did not indicate what the plaintiff would have otherwise done with those resources, nor suggest that the plaintiff would need prove that they cut other services due to the plaintiff's investigation. Moreover, almost anytime an organization such as the Fair Housing Council funds a particular project, such as the WKB investigation, the pool of resources that it has to combat other instances of discrimination grows smaller. The opportunity cost, the value of the opportunity forgone by using funds on the Olde St. Andrews testing, is real. In our world of scarce resources, every expenditure of money, time or other resources results in the loss of the benefit that would have resulted if the same time or money had been spent on something else. If the Fair Housing Council had not expended time and money on testing at Olde St. Andrews, it could have used those monies for other testing.

Indeed, the Plaintiffs argue that as a result of the Fair Housing Council's investigation of the WKB properties, FHC used a significant portion of resources that would otherwise be available for fighting disability discrimination. While not explicit, we find evidence of this shift in the Fair Housing Council's records during the time in question. For example, the final statement of work that the Fair Housing Council submitted with its 2000 grant proposal shows a clear focus on disability rights and the training and deployment of testers to investigate dwelling structures for accessibility problems. (J.A. 353.) For a housing organization that traditionally monitored and investigated a broad range of discriminatory actions, this new focus on disability discrimination very likely means that the organization turned its attention away from other incidents of discrimination.

Defendant WKB next argues that the instant case is distinguishable from *Hooker* because the *Hooker* plaintiff investigated the defendant trailer park only after receiving a complaint of

discrimination, whereas the Fair Housing Council received no complaints of discrimination prior to investigating the Village of Olde St. Andrews. Essentially, WKB suggests that any injury that may stem from the Fair Housing Council's investigation of WKB properties is not fairly traceable to the acts of the Defendants because the Fair Housing Council initiated the investigation.

In the instant case, the Fair Housing Council was tipped off to potentially discriminatory conditions at the Village of Olde St. Andews after noticing that all of the units in the development had steps leading to the front door, creating an "inaccessible route" for disabled individuals. (Dist. Ct. Op. 15-16, J.A. 89-90.) Part of the Fair Housing Council's mission includes investigating and monitoring housing developments for suspected incidences of discrimination. Regardless of whether an organization learns of potential discrimination through independent complaints or through its own observations, any action it takes in combating that discrimination is fairly traceable to the defendant's discriminatory acts. *See e.g., Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir.1994) (finding that a housing organization had standing when the organization, acting on its own initiative rather than in response to a specific complaint, sent testers to investigate racial steering at certain New York City rental properties).

We accordingly find that the resources that the Fair Housing Council directed toward training and employing testers to investigate the Village of Olde St. Andrews constitutes a concrete injury.[4]

---

[4] The Plaintiffs additionally argue that even were we to find that the direct testing costs do not constitute a traceable injury, they suffered other concrete injuries sufficient to confer standing. The Plaintiffs specifically point to several tasks that the Fair Housing Council claims its staff performed in lieu of other normal agency operations, such as training and recruiting the testers and designing the testing portion of the investigation, observing the Village of Olde St. Andrews development, meeting with the Center for Accessible Living. As proof of these prelitigation activities, the Plaintiffs point to a record entitled "Plaintiffs' Diversion of Resources," which the Plaintiffs attached to their motion for Attorney Fees. This document shows that Plaintiff the Fair Housing Council's staff dedicated approximately 32

Moreover, this injury is directly traceable to the Defendants' construction of the housing development in a manner resulting in discrimination toward disabled individuals. We therefore affirm the District Court's finding that Plaintiff Fair Housing Council has standing under the Fair Housing Act.

2.      Center for Accessible Living

As we previously noted, Center for Accessible Living's asserted grounds for standing are far less established than the Fair Housing Council's. The Plaintiffs claim that the Center for Accessible Living provided the testers for the Fair Housing Council, but they offer no proof that the Center for Accessible Living did anything more than identify individuals that might serve as potential testers. Indeed, the totality of Center for Accessible Living's claimed injury - independent of the litigation - appears limited to its time spent rounding up three testers. In light of the fact that the Center for Accessible Living  has failed to present evidence of its cost or time spent recruiting testers, we cannot conclude that the Center for Accessible Living has suffered a "concrete and particularized" injury. *Sandusky Country Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). Therefore, the Court finds that Article III prohibits the Center for Accessible Living  from challenging Defendants' conduct.

B.      Statute of Limitations

The statute of limitations question presented in this case, which appears to be one of first impression, is what "act" should constitute the triggering event for claims brought under the

---

hours to the prelitigation investigation of the Village of Olde St. Andrews.  (J.A. 473-74.)

discriminatory housing provisions of the Fair Housing Act. The Defendant WKB says that the statute of limitations bars the Plaintiffs' case because the design and construction of the relevant housing units, which occurred more than two years before Plaintiffs commenced this action, tolls the statutory period. The Plaintiffs say their claims are not barred because the non-compliant structures constitute a continuing violation, such that the statute of limitations does not begin to run until the violation terminates.

Plaintiffs filed suit on October 6, 1998, alleging that the Defendants did not build the Village of Olde St. Andrews in compliance with the Fair Housing Act. On February 12, 1999, the Plaintiffs filed an amended complaint in which they also alleged Fair Housing Act violations at the Greenhurst and Deer Creek developments. The Defendants concede that the Plaintiffs' claims with regard to the Deer Creek and Village of Olde St. Andrews developments fall within the two-year statute of limitations regardless of what we ultimately determine to constitute the triggering event. The Defendants did not even complete construction on the Olde St. Andrews or Deer Creek Developments until 1999 and 2001 respectively, well after the Plaintiffs filed suit. However, the Defendants completed construction on the Greenhurst development in 1995 and had sold all but three of the units prior to February 12, 1997, two years before the Plaintiffs filed their amended complaint.

The Defendants argue that the statute of limitations should run from either the date of completion of construction or the date that each individual unit was sold, thereby barring all claims involving the Greenhurst development except with regard to the last three units that were sold after February 12, 1997. In response, the Plaintiff argues that this Court should consider buildings that

do not comply with Fair Housing Act standards to be continuing violations. Under that theory, the continuing violation doctrine would toll the statute of limitations until the Defendants remedy the conditions making the developments inaccessible to disabled individuals.

In addressing this issue, the district court agreed with the Plaintiffs that the continuing violation doctrine does apply "so long as there is some ongoing *act* being performed as it pertains to the design and construction of the development." The district court found both the Defendants' and the Plaintiffs' arguments flawed, however, with respect to what act or event should trigger the statute of limitations. As such, the district court concluded that the sale or rental of the last nonconforming unit in a development is the act or event that triggers the statute of limitations. Applying this standard, the district court held that the Plaintiffs' claims were not time barred because the last discriminatory act in this case occurred less than two years before the Plaintiffs filed this action. We agree with the district court, but explicitly limit our holding to the facts of this case.

Under the Fair Housing Act, the statute of limitations requires a plaintiff to file a complaint within two years after the "occurrence or termination of an alleged discriminatory housing practice . . . whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). Here, the particular provision of the Fair Housing Act allegedly violated makes it unlawful to "discriminate in the sale or rental, or otherwise make unavailable or deny a dwelling to any buyer or renter." 42 U.S.C. § 3604(f)(1-2). Additionally, in actions brought under the Fair Housing Act, the Supreme Court has recognized that a complaint alleging a continuing illegal practice, rather than an isolated incident of violative conduct, is timely when filed within two years of the last occurrence of the illegal practice. *Havens*, 455 U.S. at 380-81.

-19-

In appealing the judgment of the district court, Defendant WKB says that the applicable two-year statue of limitations should begin to run upon completion of the design and construction of the housing units. In support of this proposition, the Defendant argues that the design and construction of the housing units constitutes the gravamen of the Fair Housing Act violation alleged by the Plaintiffs and therefore should start the statute of limitations. The Court rejects this argument.

First, as a preliminary matter the Court finds instructive - though certainly not dispositive - that an overwhelming majority of the federal courts that have addressed this issue have rejected the position advanced by the Defendant and adopted a less restrictive interpretation of the Fair Housing Act's tolling provisions. *See, e.g., Eastern Paralyzed Veterans Ass'n, Inc. v. Lazarus-Burman Assoc.*, 133 F.Supp.2d 203 (E.D.N.Y. 2001) ( "LIHS does not complain of a discrete violation of the FHA, but instead describes an unlawful practice that . . . has continued to the present day. As such, LIHS alleges a continuing violation which, therefore, is timely made."); *Montana Fair Housing, Inc. v. American Capital Development, Inc.*, 81 F.Supp.2d 1057 (D.Mont. 1999); *Baltimore Neighborhoods, Inc. v. Rommel Builders*, 40 F.Supp.2d 700 (D. Md. 1999). Additionally, from a purely textual standpoint a violation of the relevant Fair Housing Act provision here requires more than the mere design and construction of a noncompliant housing unit. Recall, the text of the Fair Housing Act itself focuses on housing discrimination *in the sale or rental* of housing units. Accordingly, it is difficult to credit the Defendant 's assertion that the design and construction of the units in question constitute the core of any Fair Housing Act violation.

Moreover, it makes little practical sense to start the limitations period running from the date of completion of the design or construction. Often, housing units go unsold or unlet for some time

after they are built. If the statute of limitations were to begin running immediately upon completion of the building, potential buyers may not even look at the property until after the statute of limitations has run. Such a result would run counter to the well established principle that in interpreting the Fair Housing Act, courts are to give effect to the "broad remedial intent of Congress embodied in the Act." *Havens Realty Corp.*, 455 U.S. at 380-81; *see also Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972).

We find, however, that the view that the statute of limitations is tolled until the noncompliant conditions are remedied is equally inconsistent with 42 U.S.C. § 3604(f)(1). The Fair Housing Act specifies that the two year limitations period begins to run at the termination of the alleged act of discrimination. In the context of the construction and design of multifamily dwelling units that are inaccessible to disabled individuals, the discriminatory act occurs during the sale or rental of that unit. Thus, once a unit has been sold or rented, the discriminatory act is complete.

*Amici* argues that the continuing violation should apply to toll the statute of limitations even after the sale of all of the units in a particular environment. They cite *Havens*, 455 U.S. at 380-81, for the proposition that "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years][5] of the last asserted occurrence of that practice." They further claim that failing to remedy the noncompliant conditions constitutes a failure to otherwise make available accessible housing in violation of 42 U.S.C. § 3604(f)(1).

---

[5] The Havens court applied the former 180-day limitations period. The current limitations period is two years.

However, the statutory language of 42 U.S.C. § 3604(f) specifically makes the design and construction of inaccessible housing units unlawful in the context of the sale or rental of the units. Therefore, the language appearing in 42 U.S.C. § 3604(f)(1) prohibiting owners of those developments from otherwise making unavailable accessible housing serves as a catch-all provision to cover other ways that an individual may make housing unavailable to the disabled beyond the forms of discrimination listed in 42 U.S.C. § 3604(f)(3)(c).

We therefore find that in cases where the plaintiff alleges that the owner of a multi-family housing development failed to design and construct the development so as to make it accessible to disabled individuals, the limitations period will depend on the specific circumstances of each case. For example, where a disabled individual seeks to buy a particular unit and discovers that the unit is inaccessible because it was not designed in conformity with the FHA, the limitations period for that individual's claim would begin to run from the date that the individual attempted to buy the unit and discovered the nonconforming conditions. However, in a case such as the instant case, where the plaintiff alleges that the owner or developer engaged in a policy or practice throughout the entire development of constructing housing units that fail to comply with the FHA, the continuing violations doctrine applies to toll the statute of limitations until the sale of the last unit in that development. Along those same lines, where the plaintiff can show that the owner of several housing developments engaged in a continuous policy or practice with regard to the noncompliant design and construction of each of the developments, the continuing violation doctrine may toll the running of the limitations period until the last unit of all of the implicated developments is sold.

Applying this rule to the instant case, we find that the Plaintiffs' claims fall safely within the

statute of limitations. As such, the Court rejects the Defendant's argument and affirms the district court's holding that the statute of limitations does not begin to run in actions alleging this type of discriminatory practice until the last non-compliant unit is sold.[6]

C.      HUD Guidelines

Finally, Defendant WKB also says that the district court committed error in failing to allow them to demonstrate compliance with the Fair Housing Act by means other than those set forth by the applicable HUD guidelines. Once again, the Court rejects Defendant's argument. In its brief, the Defendant correctly notes that neither the language of the Fair Housing Act itself nor applicable federal regulations provide specific design and construction standards. The Defendant incorrectly alleges, however, that the district court impermissibly treated the relevant HUD guidelines as controlling authority.

In addressing whether the housing units complied with the Fair Housing Act, the district court explicitly stated that "the Guidelines, though relevant and highly significant, are not decisive. The real question is whether the units . . . are reasonably accessible and useable for most handicapped persons." Although the district court did note that "Defendants undoubtedly face a heavy burden of demonstrating accessability" in instances where a construction feature does not comply with the HUD guidelines, the touchstone of the district courts compliance analysis was clearly the Act itself. Accordingly, we find that Defendant WKB had ample opportunity to demonstrate compliance with the Fair Housing Act by means other than those set forth by the

---

[6]The Court does not address the operation of the statute of limitations in Fair Housing Act cases alleging disability discrimination in the rental of newly constructed multi-family dwellings.

applicable HUD guideline and simply failed to do so. Moreover, the Supreme Court has held that

HUD's interpretation of the FHA is entitled to deference. *See Meyer v. Holley*, 537 U.S. 280, 287-88

(2003); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210 (1972). As such, we again reject

Defendant WKB's argument and affirm the district court.

IV. Conclusion

For the foregoing reasons, this Court **AFFIRMS** in part and **REVERSES** in part the decision

of the district court.

*No. 05-5862*
*Fair Housing Council, et al. v. Village of Olde St. Andrews, et al.*

RYAN, Circuit Judge, concurring. Were it not for Hooker v. Weathers, 990 F.2d 913 (6th Cir. 1993), I would hold that the Fair Housing Council, Inc., does not have Article III standing to maintain this lawsuit. It is well settled that a housing organization that has not suffered a "concrete and demonstrable injury to [its] activities," Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982), is without standing to bring suit to enforce the Fair Housing Act, 42 U.S.C. § 3604.

It strikes me as obvious that a non-profit corporation created for the purpose, inter alia, of bringing lawsuits to enforce the FHA, has not suffered a "concrete and demonstrable injury to [its] activities," (emphasis added), simply by conducting one of its activities—finding suable defendants. But Hooker has held otherwise, and it is a binding precedent I am not free to ignore and cannot distinguish in any meaningful way. Therefore, I am compelled to concur in a judgment that the Fair Housing Council, Inc., has standing, under Article III, to sue the defendant to enforce the Fair Housing Act. I agree that the Center For Accessible Living, Inc., does not have standing. I also agree that Fair Housing's lawsuit was not barred by the applicable two year statute of limitations, 42 U.S.C. § 3613(a)(1)(A).

Cook, Circuit Judge, joins in the concurring opinion only.