**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NOLL GARCIA,
                    *Plaintiff-Appellant,*

STATE FARM FIRE AND CASUALTY
COMPANY,
                    *Intervenor-Appellee,*

                    v.

DENNIS BROCKWAY; ROBERT
STEWART; STEWART MILES &
ASSOCIATES,
                    *Defendants-Appellees,*

                    and

J. J. ZAVOSHY; Y. W. ZAVOSHY;
H&H PROPERTIES; ZAVOSHY REV.
INTER VIVOS TRUST,
                    *Defendants.*

No. 05-35647

D.C. No.
CV-03-00193-MHW

5315

Tamara Thompson; Disabled
Rights Action Committee, (a Utah
non-profit corporation),
　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

Gohres Construction Co., a
Nevada corporation; Marc
Gohres,

　　　　　　　*Defendants,*

　　　　and

Michael E. Turk,
　　　　　　*Defendant-Appellee.*

No. 06-15042

D.C. No.
CV-05-00156-ECR

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
Mikel H. Williams, Magistrate Judge, Presiding

Argued and Submitted
March 25, 2008—San Francisco, California

Filed May 13, 2008

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Andrew J. Kleinfeld, Barry G. Silverman,
M. Margaret McKeown, Kim McLane Wardlaw,
Johnnie B. Rawlinson, Richard R. Clifton, Carlos T. Bea and
N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge Pregerson;
Dissent by Judge Fisher

**COUNSEL**

Ken Nagy, Keeton and Tait, Lewiston, Idaho; Maria E. Andrade, Huntley Park, Boise, Idaho, for plaintiff-appellant Noll Garcia.

Phillip S. Oberrecht and Candy W. Dale, Hall, Farley, Oberrecht & Blanton, P.A., Boise, Idaho, for defendant-appellee Dennis Brockway.

Kirtlan G. Naylor and Carlton R. Ericson, Naylor & Hales, P.C., Boise, Idaho, for defendants-appellees Robert Stewart and Stewart Miles & Associates.

Richard Armknecht, III, Armknecht & Cowdell, P.C., Lindon, Utah, for plaintiffs-appellants Tamara Thompson and Disabled Rights Action Committee.

Joshua H. Reisman, Stanley W. Parry and William P. Curran, Curran & Parry, Las Vegas, Nevada, for defendant-appellee Michael E. Turk.

Stephen M. Dane, Michael Allen and John P. Relman, Relman & Dane PLLC, Washington, D.C.; Susan Ann Silverstein and Julie Nepveu, AARP Foundation Litigation, Washington, D.C.; Joan Sylvester Wise, AARP, Washington, D.C., for amici curiae AARP, et al., in support of the appellants.

Thomas H. Keeling and Lee Roy Pierce, Jr., Freeman D'Aiuto Pierce Gurev Keeling & Wolf, PLC, Stockton, California, for amici curiae California Building Industry Association, et al., in support of the appellees.

Jed W. Manwaring, Evans Keane LLP, Boise, Idaho, for amicus curiae Idaho Association of Realtors, in support of the appellees.

Christopher B. Hanback, Rafe Petersen and Elizabeth Phelps, Holland & Knight LLP, Washington, D.C.; Robert A. Bleicher, Holland & Knight LLP, San Francisco, California, for amici curiae National Multi Housing Council, et al., in support of the appellees.

Michael Evans, DePaul University College of Law; Christopher Brancart and Elizabeth Brancart, Brancart & Brancart, Pescadero, California, for amici curiae Silver State Fair Housing Council, Inc., et al., in support of the appellants.

---

## ORDER

The three-judge panel decision, *Garcia* v. *Brockway*, 503 F.3d 1092 (9th Cir. 2007), is adopted as the opinion of the en banc court. The opinion is amended as follows:

| | |
|---|---|
| Page 1095, Column 1, Lines 22-24 | Replace <Defendant Michael Turk is the most recent owner.> with <Defendant Michael Turk is an officer of Rancho del Norte Villas, Inc., and of Gohres Construction.> |
| Page 1097, Column 2, Line 19 | Delete footnote 4 |
| Page 1098, Column 1, Line 10 | Replace <this> with <last> |
| Page 1101, Column 1, Line 5 | After <period expired.> insert a new footnote stating: <Nothing we say precludes the application of equitable tolling if the requirements of the doctrine are met. For example, equitable tolling may be appropriate if the builder prevented testers or problem tenants from visiting the property after the issuance of a certificate of occupancy, or if a medical condition prevented a plaintiff from filing suit for some time after testing the property, *see Brockamp* v. *United States*, 67 F.3d 260, 263 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 347 (1997).> |

## OPINION

KOZINSKI, Chief Judge:

We consider when the statute of limitations begins to run in a design-and-construction claim under the Fair Housing Act (FHA).

**Facts**

In these consolidated cases, plaintiffs appeal the district court's determination that their FHA design-and-construction claim was time-barred by the two-year statute of limitations. The fact patterns in these cases (at summary judgment) differ in several significant respects:

*Garcia* v. *Brockway*, No. 05-35647: In 1993, Dennis Brockway built the South Pond Apartments in Boise, Idaho, and sold the last unit in 1994. In 1998, the Idaho Fair Housing Council filed an administrative complaint with the U.S. Department of Housing and Urban Development (HUD), and in 2001 Brockway entered into a conciliation agreement with HUD and the Idaho Fair Housing Council that resolved the complaint and provided a fund to pay for accessibility modifications to any unit for any resident with a disability.

In 2001, plaintiff Noll Garcia rented a unit at South Pond and resided there until 2003. Because of a disability Garcia uses a wheelchair for mobility. While at South Pond, his apartment did not comply with the design-and-construction requirements of the FHA. It lacked curb cuts from the parking lot to the sidewalk, it didn't have a ramp to the front entrance door and the doorways were too narrow to allow clear passage of a wheelchair. Garcia's requests that management make accessibility improvements were ignored, as was his request that management build a ramp to his door or that he be relocated to a more accessible unit. Within two years of leasing the apartment, Garcia sued the original builder and architect (Brockway and Robert Stewart, respectively), and the current owners and management (the Zavoshy defendants). The district court granted summary judgment in favor of Brockway and Stewart because Garcia's design-and-construction claim was not filed within the limitations period. The court denied the Zavoshy defendants' summary judgment on the accommodations and interference claims, and they subsequently set-

tled. Garcia appeals the summary judgment in favor of Brockway and Stewart.

*Thompson* v. *Gohres Construction Co.*, No. 06-15042: In 1997, Gohres Construction built the Villas at Rancho del Norte in North Las Vegas, Nevada. Shortly thereafter, the Villas were issued a final certificate of occupancy, and the property was sold through foreclosure in 2001. Defendant Michael Turk is an officer of Rancho del Norte Villas, Inc., and of Gohres Construction. In 1997, the Disabled Rights Action Committee (DRAC) filed a complaint with HUD, and HUD terminated the complaint in 2001 because the complainants, as "testers," lacked standing. We subsequently held that testers have standing to sue under the FHA. *See Smith* v. *Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1104 (9th Cir. 2004).

In 2004, plaintiff Tamara Thompson, a member of DRAC, "tested" the Villas and found discriminatory conditions—including an inaccessible building entrance, no curb cuts for the handicapped parking spaces and inadequate access to the pool. Within a year of Thompson's inspection, plaintiffs Thompson and DRAC sued Turk, Marc Gohres and Gohres Construction, asserting an FHA design-and-construction claim. The district court granted defendants' motion to dismiss because the claim was time-barred. We granted plaintiffs' motion to voluntarily dismiss the appeal as to Gohres and Gohres Construction. Plaintiffs thus only appeal the district court's order with respect to Turk.

## Analysis

The FHA prohibits the design and construction of multi-family dwellings that do not have certain listed accessibility features. 42 U.S.C. § 3604(f)(3)(C). The statute provides three enforcement mechanisms. First, an administrative complaint may be initiated with HUD, *see id.* §§ 3610-3612, and remedies include actual damages to the aggrieved person, civil penalties and injunctive relief. *See* 24 C.F.R. § 180.670(b)(3).

An aggrieved person—i.e., any person who "claims to have been injured by a discriminatory housing practice," 42 U.S.C. § 3602(i)(1)—must file the complaint "not later than one year after an alleged discriminatory housing practice has occurred or terminated." *Id.* § 3610(a)(1)(A)(i). HUD may also file a complaint sua sponte; it's unclear whether HUD is subject to the same limitations period. *See id.*

Second, the Attorney General may bring a civil action if a defendant has "engaged in a pattern or practice of resistance" to FHA rights, or if a "group of persons has been denied any [FHA] rights . . . and such denial raises an issue of general public importance." *Id.* § 3614(a). The FHA does not provide a statute of limitations for these actions, and other courts have held that such actions seeking equitable relief are not subject to any time limit. *See, e.g.*, *United States* v. *Inc. Vill. of Island Park*, 791 F. Supp. 354, 364-68 (E.D.N.Y. 1992); *United States* v. *City of Parma*, 494 F. Supp. 1049, 1094 n.63 (N.D. Ohio 1980). Actions seeking damages are subject to the general three-year statute of limitations, *see* 28 U.S.C. § 2415(b), and those for civil penalties must be "commenced within five years from the date when the claim first accrued." *Id.* § 2462.

**[1]** The third enforcement mechanism—the one at issue here—is a private civil action. The FHA provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). In other words, an aggrieved person must bring the lawsuit within two years of either "the occurrence . . . of an alleged discriminatory housing practice" or "the termination of an alleged discriminatory housing practice." Here, the practice is the "failure to design and construct" a multifamily dwelling according to FHA standards.[1] *Id.* § 3604(f)(3)(C). The statute

---

[1]The dissent concedes that our reading of the statute is "not entirely implausible," Dissent at 5341, but insists that the practice at issue is the

of limitations is thus triggered at the conclusion of the design-and-construction phase, which occurs on the date the last certificate of occupancy is issued. In both cases, this triggering event occurred long before plaintiffs brought suit.[2]

sale or rental of an FHA-noncompliant unit, rather than design and construction of the building. *Id.* at 5338. Therefore, according to the dissent, the statute of limitations begins to run when a party "first attempts to buy or rent or tests a FHA-noncompliant unit." *Id.* The dissent reaches this conclusion by distinguishing section (f)(3)(C) from sections (f)(1) and (f)(2) on the grounds that (f)(3)(C) is a definitional provision, whereas (f)(1) and (f)(2) provide causes of action. *Id.* at 5338, 5341-42. However, (f)(3)(C) is a coordinate section, not a subordinate section within (f)(1) or (f)(2), so treating (f)(3)(C) as subordinate makes no structural sense.

Additionally, under the dissent's interpretation, only the party that actually does the selling or renting would be liable, not the party that designed or constructed an FHA-noncompliant unit, because section (f)(1) prohibits only discrimination "in the sale or rental . . . [of] a dwelling," while section (f)(2) prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling." Thus, if (f)(3)(C) does not operate as an independent prohibition, but merely defines the meaning of "discriminate" under (f)(1) or (f)(2), Garcia wouldn't have a private cause of action under the FHA against Brockway and Stewart (the builders) because they sold or rented no individual units.

The fundamental problem with the dissent's interpretation is that isolating (f)(1) and (f)(2) from (f)(3)(C) alters both the starting point for the statute of limitations and who is liable under the FHA. Were we to adopt the dissent's interpretation, we would make it impossible, or at least more difficult, for the Attorney General to bring a design-and-construction claim against builders under 42 U.S.C. § 3614(a), because design and construction of an FHA-noncompliant building alone would not, under the dissent's interpretation, be actionable under the FHA. The dissent's interpretation therefore may help a few FHA plaintiffs today, but it could harm many more people living in FHA-noncompliant units in the future.

[2]This does not leave plaintiffs without any recourse. They can still report the violation to the Attorney General, and—long after construction is complete—he can seek to enforce defendants' legal duty to design and construct if there's "a pattern or practice of resistance," or if "any group of persons has been denied any [FHA] rights . . . and such denial raises an issue of general public importance." 42 U.S.C. § 3614(a). They can also request accommodations, for which they bear the costs, to remedy an impediment. *See id.* § 3604(f)(3)(A)-(B). Garcia's case is a good example. Despite the fact that his claims against Stewart and Brockway were time-barred, Garcia was able to obtain relief by settling with the current owners and management of South Pond with respect to his accommodations claim.

   Plaintiffs advance three theories that would extend the limitations period to cover their lawsuits. We address each in turn.

   **1.**   Plaintiffs contend that an FHA design-and-construction violation is a continuing one that does not terminate until the building defects are cured. The Supreme Court has held that "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory period, running from] the last asserted occurrence of that practice." *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380-81 (1982) (footnote omitted). Congress has since codified this continuing violation doctrine by amending the FHA to include both "the occurrence [and] *the termination* of an alleged discriminatory housing practice" as events triggering the two-year statute of limitations. 42 U.S.C. § 3613(a)(1)(A) (emphasis added).

   Plaintiffs claim Congress's insertion of "termination" would be meaningless if it weren't read as termination of the design-and-construction defect. HUD's *Fair Housing Act Design Manual* supports this reading: "With respect to the design and construction requirements, complaints could be filed at any time that the building continues to be in noncompliance, because the discriminatory housing practice—failure to design and construct the building in compliance—does not terminate." U.S. Dep't of Hous. & Urban Dev., *Fair Housing Act Design Manual: A Manual to Assist Designers and Builders in Meeting the Accessibility Requirements of the Fair Housing Act* 22 (rev. 1998).[3]

---

   [3]Plaintiffs DRAC and Thompson urge us to remand so that the district court can give the HUD Manual proper weight. *See United States* v. *Mead Corp.*, 533 U.S. 218, 234 (2001) (giving deference under *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944), to interpretations contained in agency manuals or enforcement guidelines). *Mead* does not require us to do so, *see id.* at 238, and we decline their invitation. Instead, we have considered the HUD manual in our analysis and have given it the proper *Skidmore* weight.

**[2]** Plaintiffs and HUD confuse a continuing violation with the continuing effects of a past violation. "Termination" refers to "the termination of an alleged discriminatory housing practice." The Supreme Court has "stressed the need to identify with care the specific [discriminatory] practice that is at issue." *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2167 (2007). Here, the practice is "a failure to design and construct," which is not an indefinitely continuing practice, but a discrete instance of discrimination that terminates at the conclusion of the design-and-construction phase. This violation differs from the one Congress codified as "continuing" in light of *Havens*, where the claims were "based not solely on isolated incidents . . . , but a continuing violation manifested in *a number of incidents*—including at least one . . . that [wa]s asserted to have occurred within the [limitations] period." 455 U.S. at 381 (emphasis added).

**[3]** Put differently, "[a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation."[4] *Ward* v. *Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981) (citing *Collins* v. *United Airlines, Inc.*, 514 F.2d 594, 596 (9th Cir. 1975)); *see also Moseke* v. *Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 507 (E.D. Va. 2002) ("[An] FHA non-compliant building which contains inaccessible features to disabled persons is more akin to a continuing effect rather than a continuing violation under the FHA."). The Supreme Court last Term reiterated the distinction between a

---

[4]The dissent maintains we're making a "crucial error" by defining the alleged discriminatory housing practice as the failure to design or construct an FHA-compliant unit. Dissent at 5337. The dissent seems to define the act of selling or leasing an FHA-noncompliant unit as the discriminatory housing practice. *Id.* at 5338. However, this confuses the "discrete act of alleged . . . discrimination" with the "date when the effects of this practice were felt." *Ledbetter*, 127 S. Ct. at 2168. The failure to design and construct the unit according to FHA standards is the "underlying" discrete act of discrimination. *Id.* (quoting *Lorance* v. *AT&T Techs., Inc.*, 490 U.S. 900, 911 (1989)). And the date of this underlying act "governs the limitations period." *Id.* at 2169 (quoting *Lorance*, 490 U.S. at 911).

continuing violation and continual effects when it held that "current effects alone cannot breathe life into prior, unchanged discrimination; as we held in *Evans*, such effects in themselves have 'no present legal consequences.' " *Ledbetter*, 127 S. Ct. at 2169 (quoting *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553, 558 (1977)). Although the ill effects of a failure to properly design and construct may continue to be felt decades after construction is complete, failing to design and construct is a single instance of unlawful conduct. Here, this occurred long before plaintiffs brought suit.[5] Were we to now hold the contrary, the FHA's statute of limitations would provide little finality for developers, who would be required to repurchase and modify (or destroy) buildings containing inaccessible features in order to avoid design-and-construction liability for every aggrieved person who solicits

---

[5]Garcia argues that defendants' involvement with the HUD complaint filed in 1998 continues their prior failure to design and construct. The complaint was resolved in 2001, and Stewart was dismissed from it. Pursuant to a conciliation agreement, Brockway contributed to a modification fund to assist persons with disabilities to modify the properties, including South Pond. We reject the argument that participation in a HUD investigation is an act of discrimination. Further, if such participation were to re-trigger the statute of limitations, this would create a large disincentive for builders and architects to cooperate in such proceedings when, as here, HUD initiates them after the two-year limitations period has run for private actions.

Garcia further contends that Brockway interfered with his FHA rights by not notifying him about the modification fund. But nothing in the conciliation agreement requires Brockway to notify any tenant, and no one disputes that Brockway complied with the agreement. Garcia identifies no action by defendants that would amount to "interference" with FHA rights. *See Walker* v. *City of Lakewood*, 272 F.3d 1114, 1128-29 (9th Cir. 2001).

Garcia also claims that installation of a ramp to his front door constitutes an act within the limitations period. Brockway hadn't been associated with South Pond for almost eight years when Garcia moved in, and he didn't install the ramp. Nor did Stewart design it. Events that occur after the statute of limitations has run and that do not involve defendants cannot operate to re-start the statute of limitations as to them.

tenancy from subsequent owners and managers. Indeed, now that we have recognized tester standing, an aggrieved person wouldn't even need to solicit tenancy, but merely observe the violation. *See Smith*, 358 F.3d at 1104. This is not what Congress provided in erecting a two-year statute of limitations for FHA design-and-construction claims. If Congress wanted to leave developers on the hook years after they cease having any association with a building, it could have phrased the statute to say so explicitly.

Nor may we ignore the statute of limitations to help an aggrieved person who suffers from the *effects* of such violation decades after construction. *See Boise Cascade Corp.* v. *EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."). As the Supreme Court has held, "[t]he limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect [defendants] from the burden of defending claims arising from . . . decisions that are long past." *Del. State Coll.* v. *Ricks*, 449 U.S. 250, 256-57 (1980). "A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." *Ledbetter*, 127 S. Ct. at 2168 (quoting *Evans*, 431 U.S. at 558).

**2.** Plaintiffs also argue that the statute of limitations should not begin to run until the aggrieved person *encounters* the design-and-construction defect.[6] This novel legal theory was first articulated in a law review article. *See* Robert G. Schwemm, *Barriers to Accessible Housing: Enforcement*

---

[6]Thompson and DRAC raise this claim, but Garcia only argues that his claim would be timely if the continuing violation doctrine, discovery rule or equitable tolling doctrine applied.

*Issues in "Design and Construction" Cases Under the Fair Housing Act*, 40 U. Rich. L. Rev. 753, 849-55 (2006).

**[4]** There's some support for this "encounter" theory: "A damages action under the [FHA] sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis* v. *Loether*, 415 U.S. 189, 195 (1974). Because an FHA damages action "sounds basically in tort," plaintiffs claim the statute of limitations is not triggered until a disabled person is actually damaged by the practice. Plaintiffs contend that, upon completion of construction, no injury has yet occurred, and "the standard rule [for tort purposes is] that the limitations period commences when the plaintiff has a complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund* v. *Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (internal quotation marks omitted). Under this theory, the statute of limitations did not begin to run until Thompson tested the Villas, which occurred within two years of filing suit.

**[5]** Plaintiffs make too much of the Supreme Court's observation that the FHA "sounds basically in tort." The Court was not dealing with the statute of limitations but with the very different question of whether FHA plaintiffs are entitled to a jury trial. This passing reference to tort law cannot be read to trump statutory provisions that deal expressly with the statute of limitations. The FHA's limitations period does not start when a particular disabled person is injured by a housing practice, but by "the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). Under the FHA, the ability to privately enforce the "new legal duty" thus only lasts for two years from the time of the violation, and the violation here is "a failure to design and construct." *Id.* § 3604(f)(3)(C). Plaintiff's injury only comes into play in determining whether she has standing to bring suit. *See id.* §§ 3602(i)(1), 3604(f)(2). Some aggrieved persons may not encounter this violation until dec-

ades after the limitations period has run and thus will be unable to file a civil action, even though they have standing to raise the claim. However, "[i]t goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable." *United States* v. *Kubrick*, 444 U.S. 111, 125 (1979).

Plaintiffs' theory is further undercut by our decision in *Smith*, in which we held that the harm of the violation occurs when a design-and-construction defect is observed. 358 F.3d at 1104. Under plaintiffs' theory post-*Smith*, any individual with a disability who merely observes the design-and-construction defect could bring suit—even if the limitations period had long run for every tenant and/or owner. The author of plaintiffs' encounter theory concedes that *Smith* creates serious problems for his theory: "[If] testers do have standing based on injury to their § (f)(1)-(2) rights caused by encountering such a building, they could presumably generate an endless series of such injuries by repeated visits to the building. . . . Eventually, the limitations periods would run on the claims based on the earlier encounters, but the tester could always start a new clock by returning to the building." Schwemm, 40 U. Rich. L. Rev. at 859 (footnote omitted). The encounter theory thus "raise[s] serious equitable issues with respect to timeliness," *id.*, because it strips the statute of limitations of all meaning.

**3.**   Garcia argues that the limitations period does not begin to run until the aggrieved person *discovers* the design-and-construction defect.[7] Garcia advances this theory as both the discovery rule and the equitable tolling doctrine, but neither helps him.

---

[7]Plaintiffs Thompson and DRAC do not raise this claim.

**[6]** The discovery rule serves to extend the time from which the limitations period starts to run until "the plaintiff knows both the existence and the cause of his injury." *Kubrick*, 444 U.S. at 113. Garcia thus contends that the limitations period shouldn't have started to run until he first visited South Pond in 2001. The discovery rule is strikingly similar to plaintiffs' encounter theory, and thus fails for the same reasons. *See* pp. 5329-31 *supra*. Holding that each individual plaintiff has a claim until two years after he discovers the failure to design and construct would contradict the text of the FHA, as the statute of limitations for private civil actions begins to run when the discriminatory act occurs—not when it's encountered or discovered. *See* 42 U.S.C. § 3613(a)(1)(A).

"Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Santa Maria* v. *Pac. Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000). This doctrine "focuses on a plaintiff's excusable ignorance and lack of prejudice to the defendant." *Leong* v. *Potter*, 347 F.3d 1117, 1123 (9th Cir. 2003). As Judge Posner has explained, "[e]quitable tolling is frequently confused . . . with the discovery rule . . . . It differs from the [discovery rule] in that the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." *Cada* v. *Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).[8]

Here, Garcia doesn't claim he was injured within the limitations period but was unable to obtain vital information concerning the existence of his claim until the period expired.[9]

---

[8]Contrary to the dissent's claim, we're not "holding that Congress intended to bar equitable tolling for *all* FHA claims." Dissent at 5343 n.5. Rather, equitable tolling simply doesn't apply here, as this is not a case where the plaintiff was injured within the limitations period yet unable to determine the source of his injury.

[9]Nothing we say precludes the application of equitable tolling if the requirements of the doctrine are met. For example, equitable tolling may

Instead, he basically contends that it would be inequitable not to allow him to bring a civil lawsuit. Fairness, without more, is not sufficient justification to invoke equitable tolling, and the district court properly refused to apply it. In his plea for a fairer outcome, Garcia fails to mention the extreme prejudice defendants would suffer if plaintiffs could indefinitely bring civil damages actions for buildings defendants no longer own and cannot fix without the cooperation of the current owners. This is hardly a situation where there is a "lack of prejudice to the defendant." *Leong*, 347 F.3d at 1123.

In sum, application of the discovery rule or the equitable tolling doctrine, as the district court noted in *Garcia*, "would render the clear language of the statute meaningless and superfluous." Both doctrines would have the same effect as the continuing violation doctrine by tolling the statute of limitations indefinitely and thus stripping it of all meaning. *See* pp. 5326-29 *supra*. Even if we thought this interpretation were more equitable, we don't have the authority to "interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade*, 942 F.2d at 1432.

\* \* \*

**[7]** As both district courts held, an aggrieved person must bring a private civil action under the FHA for a failure to properly design and construct within two years of the completion of the construction phase, which concludes on the date that the last certificate of occupancy is issued. Because neither plaintiff brought a timely suit, their cases were properly dismissed.

---

be appropriate if the builder prevented testers or problem tenants from visiting the property after the issuance of a certificate of occupancy, or if a medical condition prevented a plaintiff from filing suit for some time after testing the property, *see Brockamp* v. *United States*, 67 F.3d 260, 263 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 347 (1997).

**AFFIRMED**.

PREGERSON and REINHARDT, Circuit Judges, dissenting:

We adopt in full Judge Fisher's dissent to the three-judge panel's decision, *Garcia v. Brockway*, 503 F.3d 1092, 1101-11 (9th Cir. 2007) (Fisher, Circuit Judge, dissenting), which also appears immediately below, as the dissenting opinion of the en banc minority. We write additionally only to emphasize the extent to which the majority's holding perverts the purpose and intent of the statute. Indeed, the majority's decision well illustrates how statutes of limitations have been twisted by courts to limit the scope and thrust of civil rights laws.

The majority takes an Act that was designed to protect disabled persons by mandating that multifamily housing be made accessible to them and construes its statute of limitations in a way that solely benefits the housing construction industry and renders the statute of far less use to disabled individuals than Congress intended. The Fair Housing Act ("FHA") contains a 30 month grace period that gave developers building new multifamily housing clear notice of what was required to satisfy the statute's accessibility standards. *See* 42 U.S.C. § 3604(f)(3)(C). There is no reason that a developer who fails to comply with these requirements should not be held accountable for such violations. Nevertheless, the majority holds that unless a disabled person happens to become aware of the developer's failure to comply within two years after the certificate of completion is issued, the developer is home-free —completely immune from suit.[1] Thus, a disabled person

___

[1]We recognize that "testers" may also bring FHA design-and-construct claims. We do not believe, however, that the efforts of disability rights organizations, however effective they may be, can somehow make up for the fact that the majority's construction essentially precludes causes of action brought by the very persons the statute was intended to protect: disabled individuals.

who seeks to acquire an FHA non-compliant unit in a housing development more than two years after the development is certified for occupancy cannot sue the developer even if no person familiar with the needs of disabled persons had previously seen the property and no disabled person had been aware of or injured by the violation until the would-be plaintiff attempted to buy or lease the unit. It seems apparent to us that Congress intended the statute of limitations to have the opposite result: that the disabled person who is injured by the developer's violation of the FHA should be able to sue that developer if he institutes his action within two years of the injury. It did not intend to invite the developer to assume the risk of non-compliance, in order to save construction costs, by taking the chance that his violation of the law would remain undiscovered by the disabled community for a period of two years.

The purpose of the FHA's design and construction requirements was to protect an important civil right. It was to help provide disabled individuals equal access to multifamily housing and to eliminate the de facto segregation to which handicap-inaccessible housing gives rise. *See* H.R. Rep. No. 100-711, at 27-28 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2188-89 ("The Committee believes that these basic features of adaptability are essential for equal access and to avoid future de facto exclusion of persons with handicaps, as well as being easy to incorporate in housing design and construction. Compliance with these minimal standards will eliminate many of the barriers which discriminate against persons with disabilities in their attempts to obtain equal housing opportunities."). The Act, including its statute of limitations provision, is to be construed in a manner that accomplishes this purpose. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972) (mandating a "generous construction" of the FHA's complaint-filing provisions to "give vitality to" the statute's "broad and inclusive" language); *McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir. 2004). This the majority has not done. Instead, it construes the FHA's

statute of limitations so as to offer the least benefit to disabled persons and the most to developers of multifamily housing. Because we cannot condone a construction so wholly at odds with the purpose of the statute, and the manner in which we are to construe it, we respectfully dissent.

---

FISHER, Circuit Judge, dissenting:

I respectfully dissent. The majority erroneously treats a building's improper design and construction as the event that triggers the Fair Housing Act's (FHA) two-year statute of limitations. It does so by finding an ambiguity in the statute and then resolving that ambiguity contrary to the overall purpose and structure of the FHA and its legislative and judicial history.

I believe instead that the most plausible reading of the statute is that the limitations period begins (at the earliest) when a disabled person actually experiences discrimination — either in attempting to buy or rent a noncompliant housing unit, in "testing" such a unit or upon moving in as a tenant. The majority contravenes the general rule that statutes of limitations are triggered by the accrual of a plaintiff's cause of action. Under the majority's approach, a real estate developer or landlord of a noncompliant building will often be immunized from suit long before a particular disabled individual has been injured and able to challenge the noncompliant features. Importantly, the majority's position is at odds with the FHA's legislative history, with Supreme Court precedent regarding the statute's construction and with the longstanding interpretation of the government agency charged with administering the FHA.

As a result of the majority's reading, disabled persons — the statute's actual intended beneficiaries — will be stripped of their ability to enforce the FHA's most important protec-

tion and instead will be relegated to "reasonable modifications" at their own expense. In contrast, real estate developers and landlords who ignore the FHA's design requirements will receive a free pass once two years have elapsed since a defective building's construction. Ironically, by invoking provisions Congress inserted into the FHA to expand disabled persons' access to the courts and to facilitate private enforcement, the majority transforms a statute of limitations into a highly unusual statute of repose for the benefit of real estate developers and landlords.

I would hold that Appellants' claims are not time-barred. Noll Garcia filed suit within two years of moving into the South Pond Apartments, and Tamara Thompson sued less than a year after finding discriminatory conditions at the Villas at Rancho del Norte. Accordingly, I would reverse the district courts' rulings and remand so that Appellants may proceed with their cases.

## I.

The majority begins its analysis of private civil actions under the FHA by correctly quoting the applicable statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last . . . ."). But the majority then commits a crucial error that underlies the rest of its decision. "Here," the majority states, "the [discriminatory housing] practice is the 'failure to design and construct' a multifamily dwelling according to FHA standards." Majority Op. at 5324; *see also id.* at 5327 ("Here, the practice is 'a failure to design and construct,' . . . ."); *id.* at 5330 ("[T]he violation here is 'a failure to design and construct.' "). Having conceived of Appellants' claims as being limited to the design and construction of the South Pond Apartments and the Villas at Rancho del Norte, the majority leaps to the conclusion that those claims are time-barred. "In both cases,

th[e] triggering event," i.e., "the conclusion of the design-and-construction phase," "occurred long before plaintiffs brought suit." *Id.* at 5325-26.

The problem with the majority's analysis is that a "failure to design and construct" is not *itself* an event that can trigger the FHA's statute of limitations. Under § 3613(a)(1)(A), an "*aggrieved* person" must file suit within two years of "the occurrence or the termination of an alleged *discriminatory housing practice*" (emphases added). Section 3602(f) defines a discriminatory housing practice, in relevant part, as "an act that is *unlawful* under section 3604 . . . of this title" (emphasis added). Section 3604, in turn, states that "it shall be unlawful," among other things, "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap," § 3604(f)(1), and "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection such dwelling, because of a handicap," § 3604(f)(2). Section 3604 *separately* states that "[f]or purposes of this subsection, discrimination includes — . . . a failure to design and construct [covered multifamily] dwellings" in accordance with various requirements concerning accessibility to and use by disabled persons. § 3604(f)(3)(C).

The most natural reading of these provisions is that the FHA's statute of limitations is triggered when someone is aggrieved by one of the unlawful actions specified by § 3604(f)(1) or § 3604(f)(2), with the two-year period running from the occurrence or termination of the offending practice. The limitations period for a disabled would-be buyer or renter or tester thus begins (at the earliest) when that individual first attempts to buy or rent or tests a FHA-noncompliant unit.[1] At

---

[1] Under *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1102 (9th Cir. 2004), a "tester," i.e. "someone having no interest in actually buying or renting that poses as buyer or renter to collect evidence of unlawful housing practices," has standing to sue under the FHA.

that point — but not previously — it can be said that a real estate developer or landlord has "discriminate[d] in the sale or rental, or [has] otherwise ma[d]e unavailable or den[ied] a dwelling to [the individual] because of a handicap," § 3604(f)(1), or has "discriminate[d] against [the individual] in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a handicap," § 3604(f)(2). Until then, the disabled person has not been subjected to any discriminatory action. Analogously, the limitations period for an actual tenant begins (at the earliest) when the individual first moves into a FHA-noncompliant unit. Only at that point is it fair to say that a real estate developer or landlord has "discriminate[d] against [the individual] . . . in the provision of services or facilities . . . because of a handicap." § 3604(f)(2).[2]

---

[2]I suggest that the limitations period begins *at the earliest* when a plaintiff is first injured because there is a colorable argument that the statute of limitations is not actually triggered until a covered dwelling's statutory violations have been *cured*. When Congress amended the FHA in 1988, it rewrote § 3613(a)(1)(A) so that the limitations period begins "after the occurrence *or the termination* of an alleged discriminatory housing practice" (emphasis added). *See also* House Report at 33, 1988 U.S.C.C.A.N. at 2194 ("[T]he statute of limitations is measured from the date of the *last asserted occurrence* of the unlawful practice.") (emphasis added). This language suggests that once a plaintiff has been injured by a discriminatory housing practice (and thus is "aggrieved"), he may file suit up until two years have passed since that practice was terminated. If the practice is never terminated, because the dwelling is never brought into compliance with the FHA, then the limitations period presumably never begins to run (though the plaintiff's suit may be barred by laches or other equitable doctrines).

The Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), lends support to this reading. Considering an alleged "continuing pattern, practice, and policy of unlawful racial steering," the Court held that suits under the FHA were timely as long as they were filed within 180 days (the pre-1988 limitations period) of the last application of that policy. *Id.* at 381; *see also id.* (finding claims timely because they "are based not solely on isolated incidents . . . but a continuing violation manifested in a number of incidents — including at least one . . . that is asserted to have occurred within the 180-day window"). The limitations period in *Havens* thus did not begin when the plaintiffs were first injured, but rather when the continuing statutory violation of which they were

Because real estate developers, like landlords, engage in the "provision of services or facilities" and "make unavailable or deny[ ] a dwelling" to a handicapped individual, they can be liable under (f)(2) and (f)(1).**[3]**

This reading is consistent with the understanding of other courts, commentators and, as discussed below, the Department of Housing and Urban Development (HUD), the agency charged with enforcing the FHA. *See, e.g., Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469, 481 (6th Cir. 2006) (unpublished) (FHA limitations period "begin[s] to run from the date that the individual attempted to buy the unit and discovered the nonconforming conditions"); *id.* at 480 (referring to the "overwhelming

complaining finally terminated. In *Montana Fair Housing, Inc. v. Am. Capital Dev., Inc.*, 81 F. Supp. 2d 1057, 1063 (D. Mont. 1999), similarly, the district court cited *Havens* and concluded that "[t]he pivotal date is . . . the date of the last alleged [statutory] violation." The limitations period for a disabled tenant therefore "did not begin to run on the date [she] moved in . . . but, at the earliest . . . when a ramp was finally installed outside her apartment." *Id. But see Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469, 480 (6th Cir. 2006) (unpublished) (rejecting proposition that FHA's limitations period "is tolled until the noncompliant conditions are remedied").

We need not decide here whether the limitations period for FHA claims begins when a plaintiff is first injured or when the alleged discriminatory housing practice terminates. Garcia and Thompson's suits were clearly timely even under a first-injury rule.

**[3]**Even if the majority were correct that § (f)(3) provides a cause of action separate from subsections (f)(1) and (f)(2), it is undeniable that plaintiffs do not *have* to bring suit under (f)(3) if they wish to bring a claim against real estate developers. Here, for example, both Thompson and Garcia cited § 3604(f)(3)(C) in their complaints, but Thompson's complaint further alleged violations of § 3604(f)(2) and Garcia's complaint further alleged violations of both § 3604(f)(1) and § 3604(f)(2), both of which can be applied to developers as well as landlords. For the same reason, the majority's concern that the Attorney General would be hampered in bringing design-and-construction claims under my interpretation of the statute is baseless. *See* Majority Op. at 5324-25, n.1.

majority of . . . federal courts that have . . . rejected the position advanced" here by the majority); *Montana Fair Housing, Inc. v. Am. Capital Dev., Inc.*, 81 F. Supp. 2d 1057, 1063 (D. Mont. 1999); Robert G. Schwemm, *Barriers to Accessible Housing: Enforcement Issues in "Design and Construction" Cases Under the Fair Housing Act*, 40 U. Rich L. Rev. 753, 851 (2006) ("If a disabled homeseeker's § (f)(1)-(2) rights are not violated until his first encounter with the defendant's building, then a complaint filed promptly thereafter is timely, regardless of how old the building is."). The majority, however, goes down a different path, contending that it is the actions described by *§ 3604(f)(3)(C)* — namely the faulty design and construction of a covered dwelling — that trigger the FHA's statute of limitations. The majority's construction, while not entirely implausible, ultimately fails for the simple reason that § 3604(f)(3)(C) is crucially different from § 3604(f)(1) and § 3604(f)(2).

The activities specified by § 3604(f)(1) and § 3604(f)(2) — all of which involve taking action against a disabled person "because of" that person's "handicap" — are clearly "unlawful" "discriminatory housing practices" that begin the FHA's limitations period. In contrast, § 3604(f)(3)(C) is best read as a specific *example* of the discrimination that in fact becomes actionable under § 3604(f)(1) and § 3604(f)(2) — *when* that discrimination takes place "in the sale or rental . . . to any buyer or renter," § 3604(f)(1), or "against any person in the terms, conditions, or privileges of sale or rental . . . or in the provision of services or facilities," § 3604(f)(2). Section § 3604(f)(3)(C) is a *definitional* provision, stating that "discrimination includes . . . the [faulty] design and construction of covered multifamily dwellings," rather than a provision that actually sets forth a cause of action.[4] The construction of

---

[4]The majority reads far too much into § 3604(f)(3)(C)'s placement as coordinate with subsections (f)(1) and (f)(2). *See* Majority Op. at 5324-25, n.1. Section (f)(3) is framed very differently from (f)(1) and (f)(2), indicating that it is a definitional provision, not a coordinate one. Section 3604

a FHA-noncompliant building thus no more triggers the FHA's statute of limitations than the creation of any other latent discriminatory condition or policy (e.g., a landlord's policy — as yet unenforced — not to rent to disabled people). It is only when that latent condition or policy results in an action prohibited by § 3604(f)(1) or § 3604(f)(2) that the limitations period begins. Beforehand, the improperly designed building (and the landlord's unimplemented rental policy) are much like a potentially dangerous ditch into which no one has yet fallen — *capable* of inflicting harm and violating the law, but not yet actually doing either. *See Village of Olde St. Andrews, Inc.*, 210 F. App'x at 480 ("[F]rom a purely textual standpoint a violation of the relevant Fair Housing Act provision here requires more than the mere design and construction of a noncompliant housing unit. Recall, the text of the Fair Housing Act itself focuses on housing discrimination *in the sale or rental* of housing units.") (emphasis in original).

Applying this analysis to the cases at hand, Appellants' suits were plainly timely. While both the South Pond Apartments and the Villas at Rancho del Norte were built more than two years before Garcia and Thompson sued, this fact is irrelevant since their rights under § 3604(f)(1) and § 3604(f)(2) were not violated until they came into contact with the defective buildings. Garcia's limitations period thus began no earlier than when he moved into South Pond (less than two years before he filed suit), and Thompson's limitations period began no earlier than when she tested the Villas (less than one year before she brought her claims). It is on *those* dates — not when South Pond and the Villas were constructed — that Garcia and Thompson were the victims of dis-

states that it is "unlawful" to do the actions described in (f)(1) and (f)(2), but does not state that the actions in (f)(3) are similarly unlawful. The legislative history confirms this interpretation. *See* H.R. Rep. No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 ("House Report") (referring to "the general prohibitions under (f)(1) and (2)" and characterizing "[n]ew subsection [3604](f)(3)" as merely "augment[ing]" them).

criminatory housing practices that triggered the FHA's statute of limitations.

My conclusion that Appellants' suits are not time-barred is thus based directly on the statutory text, and does not depend on the statute's codification of the continuing violations doctrine. Nevertheless, it is worth noting that the majority's analysis of that doctrine, *see* Majority Op. at 5326-29, suffers from the same defect as its analysis of the rest of the statutory text. Appellants "confuse a continuing violation with the continuing effects of a past violation," *id.* at 5327, only if the relevant violation is defined (incorrectly) as a failure to design and construct FHA-compliant dwellings. If the violation is properly characterized as a practice of carrying out the actions prohibited by § 3604(f)(1) and § 3604(f)(2), then it is plain that Appellees' unlawful conduct itself — as opposed to merely its consequences — continues until that practice is halted. *See* Schwemm, *supra*, at 848 ("[A] nonconforming building amounts to an ongoing discriminatory denial of 'privileges' or 'facilities' to disabled tenants and homeseekers regardless of how many years have passed since the building was completed."); *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (holding that FHA suit is timely if allegedly unlawful policy continues into the limitations period).[5]

---

[5]Even if my reading of the statutory text is incorrect and the majority is right that the FHA's statute of limitations begins to run "at the conclusion of the design-and-construction phase," Majority Op. at 5324, the majority's reasons for rejecting the *equitable tolling doctrine* are unpersuasive. The starting presumption, read into every federal statute of limitations is that filing deadlines are subject to equitable tolling unless there is "good reason to believe that Congress did *not* want the equitable tolling doctrine to apply." *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1188 (9th Cir. 2001) (en banc) (quoting *United States v. Brockamp*, 519 U.S. 347, 350 (1997)). The statutory considerations that preclude the application of the equitable tolling doctrine are absent in this case.

First, § 3613 sets forth its time limitation in "fairly simple" form, neither "unusually emphatic" nor "highly detailed" and "technical." *Brockamp*, 519 U.S. at 350. Second, tolling the FHA's statute of limitations

## II.

The majority's interpretation not only disconnects "design and construction" from § 3604(f)(1) and § 3604(f)(2), but it is also flawed because it triggers the limitations period before a particular plaintiff has been "aggrieved"—i.e., injured. *See* Majority Op. at 5329 ("The FHA's limitations period does not start when a particular disabled person is injured by a housing practice . . . ."); *id.* at 5330 ("Some aggrieved persons . . . will be unable to [ever] file a civil action . . . ."). This reading conflicts with the statutory text as well as the presumption that statutes of limitations are not triggered at least until the plaintiff's cause of action has accrued. In effect, the majority converts what is plainly a statute of *limitations* into a statute of *repose*.

Subsection 3613(a)(1)(A) states that only "[a]n *aggrieved* person" may file suit under the FHA (emphasis added). Under § 3602(i), " '[a]ggrieved person' includes any person who — (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." Accordingly, until a plaintiff has become "aggrieved," he can-

---

would not produce the kind of administrative nightmare that suggests "Congress would likely have wanted to decide explicitly whether, or just where and when, to expand the statute's limitations periods, rather than delegate to the courts a generalized power to do so wherever a court concludes that equity so requires." *Id.* at 353. Indeed, the Department of Housing and Urban Development (HUD) — the administrative agency charged with administering the FHA — has weighed in against the majority's interpretation of § 3613. Finally, the FHA does not already provide for generous tolling or other broad exceptions. *See United States v. Beggerly*, 524 U.S. 38, 48-49 (1998).

Whether the doctrine of equitable tolling should be applied in these cases remains an open question that the district courts should address in the first instance on remand. What I cannot accept is the majority's implied holding that Congress intended to bar equitable tolling for *all* FHA claims.

not "commence a civil action"; and until he can legally initiate his action, there is no reason even to consider the further requirement that FHA suits be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." § 3613(a)(1)(A); *see Havens*, 455 U.S. at 381 (linking start of FHA's limitations period to plaintiffs' assertions that they were "deprived . . . of the benefits of interracial association" and suffered "injury to [their] counseling and referral services"); *Village of Olde St. Andrews*, 210 F. App'x at 481.

The majority asserts, however, that the "aggrieved person" terminology pertains only to potential plaintiffs' *standing* to file suit. But this is not how very similar language in other statutes of limitations has been interpreted. Title VII of the Civil Rights Act of 1964, for example, refers to "person[s] aggrieved" and states that the limitations period begins "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In its recent decision interpreting this provision, the Supreme Court never so much as hinted that Title VII's limitations period would commence before a plaintiff was injured. Indeed, the Court declared that if "an employer forms an illegal discriminatory intent towards an employee but does not act on it until 181 days later," "[t]he charging period would not begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet been joined." *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2171 n.3 (2007) (emphasis added); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 n.7 (2002) (declining to decide "whether [Title VII's limitations period] begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered," but not suggesting that limitations period might commence *before* injury takes place).[6]

---

[6]The majority misreads *Ledbetter* as standing for the proposition that an individual's first experience of discrimination can nonetheless constitute

The decisions the majority cites also undercut its reading of the "aggrieved person" language. "The issue" in *United States v. Kubrick*, 444 U.S. 111, 113 (1979), was "whether the claim [under the Federal Tort Claims Act] 'accrues' . . . when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice." Both of these possibilities are plainly inconsistent with a theory under which the FTCA's limitations period would begin before a plaintiff has been injured in the first place. Similarly, Judge Posner recognized in *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 449 (7th Cir. 1990), that until an "adverse personnel action [has been] taken," a plaintiff's "claim has not accrued and the statute of limitations has not begun to run." In Judge Posner's view, in fact, limitations periods do not begin when plaintiffs are injured but rather when they *discover* that they have been injured. *See id.* at 450 ("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date — often the same, but sometimes later — on which the plaintiff discovers that he has been injured.").

*Ledbetter*, *Morgan*, *Kubrick* and *Cada* are all illustrations of the general rule that statutes of limitations are not triggered at least until a plaintiff's cause of action has accrued. This general rule — which the majority fails to acknowledge, let alone rebut — has been explicitly articulated by the Supreme Court. "While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not

---

the mere "effects" of a past discriminatory decision for statute of limitations purposes. *See* Majority Op. at 5328, n.5. As *Ledbetter* makes clear, however, the statute of limitations does not begin to run until the individual *actually experiences* the discrimination herself — i.e., when a discriminatory decision "was made and communicated to [the plaintiff]" — *not* when the defendant adopted a policy that might someday impact a particular plaintiff. *See Ledbetter*, 127 S. Ct. at 2169.

infer such an *odd result* in the absence of any such indication in the statute." *Reiter v. Cooper*, 507 U.S. 258, 267 (1993) (emphasis added); *see also Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 201 (1997) ("Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief."); *cf. Meyer v. Holley*, 537 U.S. 280, 285 (2003) (FHA claims are analogous to suits in tort, for which limitations period begins at time of injury); *Curtis v. Loether*, 415 U.S. 189, 195 (1974) (same). Under the majority's reading, the "odd result" discussed in *Reiter* becomes the law of this circuit. The FHA's two-year limitations period begins to run as soon as a covered building's construction has been completed, even though no plaintiff has yet been injured or can yet sue. Such an unusual rule should follow only if it were unambiguously compelled by the statutory text — which it is not.

The majority's error is further exposed by our case law on statutes of limitations in contrast to statutes of repose. "Although the distinction between [the two] is often blurred, statutes of limitations differ from statutes of repose because the former bar[ ] plaintiff[s] from bringing an already accrued claim after a specified period of time, whereas the latter terminate[ ] a right of action after a specific time, even if the injury has not yet occurred." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 952 n.7 (9th Cir. 2005) (third alteration in original) (internal quotation marks omitted); *see also Johnson v. Aljian*, 490 F.3d 778, 781 n.12 (9th Cir. 2007) (same); *Underwood Cotton Co. v. Hyundai Merchant Marine (Am.), Inc.*, 288 F.3d 405, 408-09 (9th Cir. 2002) (statute of limitations bars suit because "plaintiff was not diligent enough," while statute of repose "is not concerned with the plaintiff's diligence; it is concerned with the defendant's peace"). The majority's interpretation effectively transforms § 3613 into a statute of repose. A disabled plaintiff's "right of action" is "terminate[d] . . . after a specific time," namely the construc-

tion of a covered dwelling, "even if the injury has not yet occurred," *Fields*, 413 F.3d at 952 n.7, and even if the plaintiff has been "diligent enough," *Underwood Cotton*, 288 F.3d at 408.

It is patently clear, however, that § 3613 is actually a statute of limitations. The Supreme Court explicitly labeled it as such in *Havens*, *see* 455 U.S. at 369, 381; the provision is almost identical to 42 U.S.C. § 2000e-5(e)(1), which the Court described as a statute of limitations in *Ledbetter*, *see* 127 S. Ct. at 2166, 2177; Congress repeatedly referred to § 3613 as a statute of limitations in the legislative history, *see* House Report at 16-17, 33, 39, 1988 U.S.C.C.A.N. at 2177-78, 2194, 2200; and even the majority characterizes § 3613 as a statute of limitations and never utters the term "statute of repose."[7] The majority's reading is thus precluded by both our case law and the majority's own terminology. If § 3613 is in fact a statute of limitations rather than a statute of repose, then it cannot be triggered by the construction of an FHA-noncompliant dwelling.

## III.

The majority's position also conflicts with the relevant legislative history, Supreme Court precedent regarding the FHA's construction and HUD's interpretation of the statute it is responsible for administering. The House Report that accompanied the Fair Housing Amendments Act of 1988 (in which the current language of § 3613(a)(1)(A) was adopted) stated that private enforcement of the FHA had been "hampered by a short statute of limitations" and that "[e]xisting law

---

[7]Moreover, "one typically expects to see a longer period [before suits are barred] in true statutes of repose." *Underwood Cotton*, 288 F.3d at 408; *see, e.g.*, *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1156 (9th Cir. 2000) (referring to the General Aviation Revitalization Act of 1994's 18-year statute of repose). A two-year limitations period is relatively short and thus further confirms that § 3613 is a statute of limitations rather than a statute of repose.

has been ineffective because it lacks an effective enforcement mechanism." House Report at 16, 1988 U.S.C.C.A.N. at 2177. Accordingly, "[t]he bill strengthen[ed] the private enforcement section by expanding the statute of limitations" from 180 days to two years. *Id.* at 17, 1988 U.S.C.C.A.N. at 2178. The House Report added that the term "termination" had been added to § 3613(a)(1)(A) in order to "reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice." *Id.* at 33, 1988 U.S.C.C.A.N. at 2194. This language demonstrates that Congress intended to expand access to the courts and facilitate private enforcement when it amended the FHA. This intent, however, cannot be reconciled with the majority's interpretation of the statute, which forever immunizes developers and landlords of FHA-noncompliant buildings from disabled persons' private enforcement actions once two years have passed since the buildings' construction.

In accordance with the statutory text and the legislative history, the Supreme Court has frequently instructed that the FHA should be interpreted flexibly in order to effectuate Congress' ambitious remedial goals in passing the statute. *See, e.g.*, *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) ("We also note precedent recognizing the FHA's 'broad and inclusive' compass, and therefore according a 'generous construction' to the Act's complaint-filing provision.") (citation omitted); *Havens*, 455 U.S. at 380 (referring to the "broad remedial intent of Congress embodied in the Act"); *id.* (warning against a "wooden application" of the FHA's statute of limitations); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the Act is broad and inclusive."). The majority's position defies these repeated admonitions. Instead of construing the FHA with an eye toward realizing its broad remedial aims, the majority improperly elevates a definitional provision, § 3603(f)(3)(C), above the provisions under which plaintiffs actually bring their claims, and disregards the presumption that statutes of

limitations are not triggered at least until the plaintiff has been injured. As a result, Congress' goal of "removing barriers to the use of court enforcement by private litigants" — a goal the Court has explicitly endorsed — is thwarted rather than advanced. House Report at 13, 1988 U.S.C.C.A.N. at 2174.

Lastly, as the majority acknowledges, HUD has issued a manual taking the position that suits can be filed " 'at any time that the building continues to be in noncompliance.' " Majority Op. at 5326 (quoting U.S. Dep't of Hous. & Urban Dev., *Fair Housing Act Design Manual: A Manual To Assist Designers and Builders in Meeting the Accessibility Requirements of the Fair Housing Act* 22 (rev. 1998)); *see also* U.S. Dep't of Hous. & Urban Dev., *Title VIII Complaint Intake, Investigation, and Conciliation Handbook* 3-5 (1995) ("A complainant aggrieved because an otherwise covered multi-family dwelling unit was not designed and constructed [properly] . . . may allege a continuing violation regardless of when construction of the building was completed."). I agree that HUD's manual and handbook are entitled only to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), but I believe, contrary to the majority, that HUD's interpretation is persuasive and dovetails with both the statutory text and non-textual considerations. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 107 (1979) ("[HUD's] interpretation of the [FHA] ordinarily commands considerable deference."); *Trafficante*, 409 U.S. at 210 ("[T]he consistent administrative construction of the [Fair Housing] Act . . . is entitled to great weight.").

## IV.

The majority argues that my interpretation of the statute — under which the limitations period for private suits brought under the FHA begins no earlier than when a plaintiff is first injured by a discriminatory housing practice — would "eviscerate[ ]" the FHA's statute of limitations and have adverse consequences for real estate developers. Majority Op. at 5328;

*see id.* at 5331-32 (discussing the "extreme prejudice defendants would suffer if plaintiffs could indefinitely bring civil damages actions for buildings defendants no longer own and cannot fix without the cooperation of the current owners").[8] This contention is meritless. First, the FHA's limitations period would not be obviated by my reading of the statute. In fact, plaintiffs would be barred from bringing suit under § 3604(f)(1) and § 3604(f)(2) once two years have elapsed since their injuries, and potential defendants would be immunized from suit two years after remedying the statutory violations of covered dwellings.[9] It is also hard to see how an interpretation that follows the accrual rule presumption can be more radical than one that flouts it.

Second, the legislative history demonstrates that Congress did not share the majority's solicitude for real estate developers. In passing the FHA, and then in amending it in 1988, Congress intended to issue "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." House Report at 18, 1988 U.S.C.C.A.N. at 2179.[10] Congress notably

---

[8]The majority expresses no particular concern for landlords, but it is clear that its approach would immunize them from suit as well. While Garcia appeals only the summary judgment in favor of Brockway and Stewart (the original builder and architect of the South Pond Apartments), Thompson appeals only the dismissal of her claims against Turk (the current owner of the Villas at Rancho del Norte). The majority affirms the district court's dismissal of Thompson's claims even though its professed worry about "plaintiffs . . . indefinitely bring[ing] civil damages actions for buildings defendants no longer own and cannot fix without the cooperation of the current owners," Majority Op. at 5332, is plainly groundless as to Turk.

[9]Under the alternate theory discussed in footnote 2, *supra*, plaintiffs would be barred from filing suit after dwellings' statutory violations have been cured and two years have elapsed since that curing.

[10]Echoing Congress' "clear pronouncement," the Supreme Court has emphasized the rights of the disabled in its FHA decisions. The Court's repeated references to the FHA's "broad and inclusive" language, the

did not express any concern about builders who failed to comply with the relatively modest requirements of § 3604(f)(3)(C) being held to account for their failures more than two years after the offending dwellings were constructed. Indeed, in 1999, Congress rejected a proposed bill that would have barred the FHA's application to housing that was FHA-noncompliant but that had "received a building permit or other similar approval . . . as meeting the requirements of the applicable building code." Justice in Fair Housing Enforcement Act of 1999, H.R. 2437, 106th Cong. § 2(2). Congress was unpersuaded by the bill's proponents that it should "provide relief from prosecution to those in the building community who may have committed building design violations" since the FHA was amended 11 years earlier. *Justice in Fair Housing Enforcement Act of 1999: Hearing on H.R. 2437 Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 1999 WL 983520 (statement of Chairman Charles T. Canady). Ironically, the majority now creates for real estate developers the time-bar they were denied by Congress.[11]

Third, to the extent policy considerations are relevant here, they cut against the majority's position. Under its reading of the statute, the intended beneficiaries of the FHA — disabled persons — are barred from enforcing their right to accessible

---

"generous construction" that the statute should be accorded and the "broad remedial intent of Congress embodied in the Act" plainly contain no loophole for real estate developers' interests. *Havens*, 455 U.S. at 380; *Trafficante*, 409 U.S. at 209; *see also City of Edmonds*, 514 U.S. at 731-32 (recommending that "an exception to a general statement of policy [in the FHA be] read narrowly in order to preserve the primary operation of the [policy]") (second alteration in original) (internal quotation marks omitted).

[11]Notably, no matter how the FHA's statute of limitations for private suits is interpreted, developers may still in some instances be subject to suits brought by the Department of Justice under its "pattern or practice" authority. *See* § 3614(a).

housing (other than through reasonable modifications at their own expense) as soon as two years have elapsed since the completion of a dwelling's construction. A builder could even construct a FHA-noncompliant dwelling and insulate himself altogether from suit simply by waiting two years to look for tenants. *See Village of Olde St. Andrews*, 210 F. App'x at 480 ("Often, housing units go unsold or unlet for some time after they are built. If the statute of limitations were to begin running immediately upon completion of the building, potential buyers may not even look at the property until after the statute of limitations has run. Such a result would run counter to . . . the broad remedial intent of Congress embodied in the Act.") (internal quotation marks omitted). Moreover, the judicial interest in having cases brought while relevant evidence is still available is at a low ebb here. As one district court has observed, "as the FHA requires no showing of intent, defendant's architectural plans and apartment complexes can themselves speak to the alleged construction violations." *Silver State Fair Housing Council, Inc. v. ERGS, Inc.*, 362 F. Supp. 2d 1218, 1222 n.1 (D. Nev. 2005).

Finally, the lot of real estate developers would not be as dire as the majority fears under my reading of the statute. One would hope that relatively few developers are (or have been) building dwellings that do not comply with § 3604(f)(3)(C). Moreover, developers might seek to shift or share their exposure through contractual provisions when they sell dwellings under which the new owners would indemnify the developers against any suits brought under § 3604. Indeed, developers are not the only parties who may be sued under the FHA. For instance, the current owner and landlord of the Villas at Rancho del Norte, Turk, is the sole remaining defendant in Thompson's case; and according to one commentator, "the general view has emerged that a wide range of participants . . . may be named as proper defendants." Schwemm, *supra*, at 778; *see also Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F. Supp. 2d 661, 665 (D. Md. 1998) ("[A]ll participants in *the process as a whole* are bound to follow the

FHAA. . . . [A]ny entity who contributes to a violation of the FHAA [is] liable.") (emphasis in original).

## V.

The majority's reading of the FHA's statute of limitations is inconsistent with the statutory text, the presumption in favor of an accrual rule, the relevant legislative history, the generous construction that the FHA must be accorded and HUD's reading of the provision. In accordance with both the statute's language itself and these non-textual considerations, I would hold that the limitations period for claims brought under § 3604(f)(1) and § 3604(f)(2) commences at the earliest when a plaintiff is first injured by a discriminatory housing practice. Applying that approach, I would reverse the district courts' rulings because both Garcia and Thompson were first injured less than two years before they filed suit, and remand for further proceedings. Therefore, I respectfully dissent.